**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Chris UMSTEAD, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 3, 2006.
Filed Jan. 19, 2007.

---

Mark Cichowicz, Public Depender, Philadelphia, for appellant.

Michael Erlich, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: FORD ELLIOTT, P.J., BOWES, J. and McEWEN, P.J.E.

OPINION BY BOWES, J.:

¶ 1 Chris Umstead appeals from the judgment of sentence imposed after he was convicted at a bench trial of aggravated assault and simple assault. After careful review, we affirm.

¶ 2 The record establishes the following. On April 22, 2004, Appellant was incarcerated at a county-operated detention center in Philadelphia when he had a verbal disagreement with another inmate named Peter Muse. Thereafter, Appellant, who resided in the same low-security dormitory as Mr. Muse, felt that he was in danger of being physically attacked by Mr. Muse and other inmates who supported Mr. Muse during the prior confrontation. As a result, Appellant left his sleeping quarters at 2:30 a.m. on April 23, 2004, approached Mr. Muse's bed, threw a mixture of scalding water and oil on Mr. Muse, and fled. Mr. Muse immediately woke up, shouted for assistance, and was taken to the facility's infirmary where he received treatment for burns to his shoulders, chest, and hands.

¶ 3 Lieutenant James Love, a corrections officer who was in charge of the detention center on the morning of the assault, interviewed Mr. Muse as he was being taken to the infirmary. Mr. Muse claimed he never saw his assailant but stated that he was involved in a heated confrontation with an inmate called "Shoppa" the previous day.[1] N.T. Suppression hearing, 11/8/04, at 9. As Lieutenant Love did not know any prisoners with the nickname "Shoppa," he proceeded to the dormitory where Appellant, Mr. Muse, and twenty-six other inmates resided.

¶ 4 Lieutenant Love entered the dormitory and spoke to each inmate individually about the incident. Specifically, he escorted each prisoner into a nearby holding area and asked if they witnessed the attack or could provide any leads to further the investigation. Lieutenant Love testified as follows:

[I questioned each inmate] [j]ust to find out who knew what. [I wanted to

determine] [i]f anyone knew any information. Could they tell me what happened. Basically I was questioning every inmate in that section; did you see what happened, what happened, tell me [what] happened.

*Id.* at 10. Lieutenant Love testified that he questioned approximately twelve inmates before he approached Appellant, and all of those men claimed to know nothing about the attack. However, when the lieutenant asked Appellant about the incident, Appellant announced, "It was me. I did it." *Id.* at 12. Moments later, Appellant spontaneously stated that he had been involved in a heated argument with Mr. Muse the previous day and declared, "I was going to get [Mr. Muse] before he got me." *Id.*

¶ 5 Based on this admission, Appellant was charged with aggravated assault and related offenses. He then filed a pretrial motion to suppress his statements to Lieutenant Love, arguing that the corrections officer should have issued *Miranda* warnings before inquiring about the incident because his questions were likely to elicit an incriminating response. A suppression hearing was conducted, and after hearing argument on the motion, the trial court declined to suppress the statements.

¶ 6 Appellant immediately proceeded to a bench trial where he testified that he lied about injuring Mr. Muse in an effort to be transferred to a different dormitory. The court convicted Appellant of aggravated and simple assault, and on January 25, 2005, imposed a sentence of five and one-half to eleven years incarceration for aggravated assault. Appellant filed a timely motion for reconsideration of sentence, which was granted. Thereafter, the court re-sentenced Appellant to five to ten

---

1. At trial, Mr. Muse testified that he actually referred to Appellant as "Soppo." N.T. Trial, 11/8/04, at 45.

years incarceration followed by three years probation. This timely appeal followed, wherein Appellant claims that the trial court erred in denying his pretrial suppression motion.

Our standard of review of a denial of suppression is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts. *Commonwealth v. Henley,* 909 A.2d 352, 358 (quoting *Commonwealth v. Reppert,* 814 A.2d 1196, 1200 (Pa.Super.2002) (en banc)) (citations and quotation marks omitted).

¶ 7 Herein, Appellant argues that his inculpatory statements to Lieutenant Love should have been suppressed pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because: (1) Appellant was in police custody when the lieutenant inquired about the assault; (2) the statements were made in response to express questioning; and (3) Lieutenant Love should have known that his questions were likely to elicit an incriminating response. The Commonwealth essentially concedes that Appellant was in police custody at all relevant times and that he was asked to provide information about a crime; however, it maintains that the statements at issue were properly admitted because the record demonstrates that Lieutenant Love did not have any suspects when he questioned Appellant and that his questions were not reasonably likely to elicit an incriminating response from Appellant. We agree with the Commonwealth's position.

¶ 8 We begin with a brief overview of *Miranda* authored by our Supreme Court in *Commonwealth v. DeJesus,* 567 Pa. 415, 787 A.2d 394 (2001). The *DeJesus* Court stated in relevant part:

The legal principles that guide us are also well-settled. As a general rule, the prosecution may not use statements, whether inculpatory or exculpatory, stemming from a custodial interrogation of a defendant unless it demonstrates that he was apprised of his right against self-incrimination and his right to counsel. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602.

"Interrogation" is defined as "questioning initiated by law enforcement officials." *Id.* at 444, 787 A.2d 394. In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the United States Supreme Court extended the definition to the "functional equivalent" of express questioning, stating:

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive

police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

*Id.* at 300–01, 100 S.Ct. 1682.

*DeJesus, supra* at 428–29, 787 A.2d at 401–02 (emphasis in original).

■ ¶ 9 Applying these principles in the case at bar, the trial court reasoned that the statements at issue were admissible as a "spontaneous confession [that] ... was not a result of interrogation." Trial Court Opinion, 3/14/06, at 6. In reaching this conclusion, the court found that Lieutenant Love did not ask questions that were likely to elicit an incriminating response and was simply performing a "fact-gathering procedure" when he asked Appellant if he could provide any information about the attack. *Id.*

¶ 10 Appellant claims the trial court's ruling is flawed and inconsistent with the decisions handed down in *Commonwealth v. DeJesus, supra, Commonwealth v. Turner,* 772 A.2d 970 (Pa.Super.2001) *(en banc),* and *Commonwealth v. Chacko,* 500 Pa. 571, 459 A.2d 311 (1983). Upon review, we find that Appellant's reliance upon these cases is misplaced.

¶ 11 In *DeJesus,* the defendant was arrested for murder and related offenses and was placed in an interview room at the police station. When he subsequently asked why criminal charges had been filed against him, a police detective stated that authorities had procured witness state-ments implicating the defendant in two shootings. Thereafter, as the defendant's biographical information was being collected, the detective repeatedly mentioned the charges and told the defendant what the witnesses had said in their respective statements. When the detective finally stopped discussing the crimes, the defendant, who had not been issued *Miranda* warnings, made several spontaneous, inculpatory statements indicating that he only shot one of the alleged victims. The defendant later filed a motion to suppress those statements, which was denied.

¶ 12 The defendant was convicted of murder and appealed the judgment of sentence, arguing, *inter alia,* that his inculpatory statements should have been suppressed for lack of *Miranda* warnings. Our Supreme Court agreed, finding that under the circumstances, "the detective should have known that his comments and conduct were reasonably likely to evoke an effort on [the defendant's] part to defend himself and give his own version of his involvement in the crimes at issue." *Id.* at 431, 787 A.2d at 403.

¶ 13 In *Turner, supra,* police officers responded to a report of an automobile accident and found the defendant leaning against a white vehicle that had apparently collided with a parked vehicle. When the defendant failed to respond to their questions and exhibited signs of intoxication, the officers placed him in the back seat of their police vehicle and called a supervisor to the scene. The supervisor arrived, and after discussing the situation with the investigating officers, opened the door to the police vehicle and asked the defendant if he had taken any narcotics. In response, the defendant stated that he had ingested cough syrup and several pills.

¶ 14 The defendant was subsequently charged with driving under the influence, and his motion to suppress his statement

to the supervisor was denied. He was ultimately convicted and received a short prison sentence. Thereafter, the defendant filed a timely appeal asserting that his statement should have been suppressed because he was subjected to police questioning regarding suspected criminal activity without the benefit of Miranda warnings. Upon review, this Court agreed that the statement was obtained in direct violation of Miranda and vacated the judgment of sentence, reasoning that "[a]s a trained officer who observed [the defendant's] physical condition, [the supervisor] should have known that [the defendant's] response might yield an incriminating statement that would lead to [his] arrest for driving under the influence." Id. at 974.

¶ 15 Finally, in *Chacko, supra*, the defendant was incarcerated at a state correctional institution when another inmate, Barney Russell, was fatally stabbed inside a cell. The following day, the defendant was informed by prison guards that a prison official, Major Lawrence Weyandt, wanted to speak to him. As a result, the defendant walked to Major Weyandt's office and sat down. While the major was using the telephone, another prison official who was present, James Wigton, asked the defendant if he was involved in the stabbing. The defendant readily admitted that he had stabbed Russell, prompting Major Weyandt to terminate his telephone conversation and issue *Miranda* warnings. Thereafter, the defendant gave multiple statements to various authorities indicating that he stabbed Russell in self-defense, which resulted in murder charges being filed against him.

¶ 16 The defendant's motion to suppress all of his inculpatory statements was denied, and he was convicted of first degree murder at a bench trial. On appeal, he argued, *inter alia*, that his initial statement to Mr. Wigton should have been suppressed because the question was likely to elicit an incriminating response, and no *Miranda* warnings had been given. Our Supreme Court agreed that the initial statement should have been suppressed but declined to grant a new trial, noting that the defendant's subsequent statements were admissible because they were made voluntarily after *Miranda* warnings were issued by Major Weyandt and other law enforcement personnel who subsequently interviewed the defendant.

¶ 17 As noted *supra*, Appellant maintains that *DeJesus, Turner,* and *Chacko* support the conclusion that his statements to Lieutenant Love should have been suppressed. We disagree. Contrary to Appellant's position, those cases are neither controlling nor instructive herein. The statement at issue in *DeJesus* was made after a detective repeatedly informed the defendant, a murder suspect, that two witnesses had implicated him in two homicides, which induced the defendant to offer his own account of the killing; thus, that case is clearly inapposite. *Turner* is also readily distinguishable, as it involved a scenario where an individual who appeared intoxicated and was suspected of driving while intoxicated was asked by a police officer if he had ingested narcotics. Hence, the only case that bears any resemblance to the instant proceedings is *Chacko*.

¶ 18 *Chacko*, however, is also distinguishable from the case at bar. Although both cases involve prison authorities questioning an inmate about a crime committed inside the prison, the investigation performed by Lieutenant Love was fundamentally different from the probe conducted in Chacko. The defendant in Chacko was specifically asked if he was involved in the stabbing that occurred the previous day, and as a result, our Supreme Court concluded that Miranda warnings were required because "such a direct question was

clearly 'likely to elicit an incriminating response.'" *Chacko, supra* at 579, 459 A.2d at 315. By contrast, in the instant case, Appellant was simply asked if he witnessed the assault; indeed, Appellant conceded at trial that "[Lieutenant Love] never asked me if I did it [i.e., injured Mr. Muse]." N.T. Trial, 11/08/04, at 73. Therefore, the record supports the trial court's determination that the questions posed by Lieutenant Love were not reasonably likely to elicit an incriminating response, and thus, Miranda warnings were not required. Accordingly, we find that the trial court properly denied Appellant's motion to suppress.

¶ 19 In so holding, we reject Appellant's underlying assertion that *Miranda* warnings are necessary in every instance where an individual who is in police custody is questioned by a law enforcement official "regarding a crime." Appellant's brief at 13. The law is clear that *Miranda* is not implicated unless the individual is in custody *and* subjected to interrogation. *See Commonwealth v. Heggins,* 809 A.2d 908 (Pa.Super.2002). Interrogation is defined as "police conduct 'calculated to, expected to, or likely to evoke admission.'" *Id.* at 914 (quoting *Commonwealth v. Mannion,* 725 A.2d 196, 200 (Pa.Super.1999) *(en banc)).* The record in this case establishes that Appellant was not a suspect when the questioning occurred, nor was he asked to disclose facts linking himself to the attack on Mr. Muse; consequently, we find that Appellant was not subjected to custodial interrogation, and *Miranda* warnings were not required. *See Pennsylvania v. Muniz,* 496 U.S. 582, 595, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (quoting *Doe v. United States,* 487 U.S. 201, 213, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988)) (the Fifth Amendment privilege against self-incrimination serves "to spare the accused from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government").

¶ 20 Judgment of sentence affirmed.