J-S72005-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| WILLIAM AMOS CRAMER, | |
| Appellant | No. 1916 WDA 2013 |

Appeal from the Judgment of Sentence Entered November 4, 2013
In the Court of Common Pleas of Cambria County
Criminal Division at No(s): CP-11-CR-0002128-2012

BEFORE:  BENDER, P.J.E., SHOGAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:           **FILED DECEMBER 2, 2014**

Appellant, William Amos Cramer ("Cramer"), appeals from the judgment of sentence of life imprisonment without the possibility of parole, and a consecutive term of 45 to 90 months' imprisonment, imposed after he was convicted of first degree murder, aggravated assault, and assault by a prisoner.  On appeal, Cramer's counsel, Ryan D. Gleason, Esq., seeks permission to withdraw his representation of Cramer pursuant to **Anders v. California**, 386 U.S. 738 (1967), as elucidated by our Supreme Court in **Commonwealth v. McClendon**, 434 A.2d 1185 (Pa. 1981), and amended in **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).  Upon review, we agree with counsel that an appeal on Cramer's behalf would be frivolous.

_____

[*] Retired Senior Judge assigned to the Superior Court.

Accordingly, we affirm Cramer's judgment of sentence and grant counsel's petition to withdraw.

The trial court set forth a detailed recitation of the facts of this case as follows:

> Sometime, on August 4, 2012, Cambria County Prison officials transferred William Sherry ("Sherry") from the general prison population to Cell 67 of the Disciplinary Housing Unit ("DHU"). Because of the transfer, Sherry became cellmates with William Amos Cramer ("Cramer"). At 8:10 P.M. of the same day, when the prison staff distributed medications, they observed no problems occurring between the two inmates. In fact, Correctional Officers Daniel Link, Alan Bertram, and John Frank did not observe any problems between the two inmates either from the moment Sherry and Cramer became cellmates until approximately 9:15 P.M.
>
> Roughly fifteen minutes later, however, at 9:30 P.M., chaos erupted. More specifically, someone activated the intercom in Cell 67 and attempted to communicate with the control unit by yelling into it. The unknown inmate's yelling, however, garbled his speech and Corrections Officers Jim Townson ("C.O. Townson") and Alan Bertram ("C.O. Bertram") were unable to decipher the message. Unsure what was occurring, C.O. Bertram informed C.O. Townson he would investigate the problem.
>
> Upon arriving at Cell 67, C.O. Bertram noticed Cramer standing in front of the cell door's window and therefore obstructing his view into the cell. Cramer yelled: "[G]et this molester out of my cell, what did you put him in here for[?]" C.O. Bertram instructed Cramer multiple times to "to get away from the window" — to "move away from the window" — so he could assess the situation. But Cramer refused to budge. Finally, C.O. Bertram faked Cramer one way and ultimately shifted Cramer's body enough that he could spot "what appeared at the time to be blood on the bottom bunk[`s mattress]."
>
> Recognizing something was amiss, C.O. Bertram pushed his Personal Alarm Transmitter button. Next, the control center signaled a Code One for the DHU, which means an officer needs

assistance. Before any help could arrive, though, C.O. Townson opened Sherry and Cramer's door from the control unit. While the door opened, C.O. Bertram jammed it partially and instructed Cramer to "put his hands out" through the cracked door. Cramer complied and C.O. Bertram cuffed one of Cramer's hands. After C.O. Bertram cuffed one hand, he noticed Corrections Officers John Frank ("C.O. Frank") and Terry Shean were relatively close. So he left the door he was jamming go, cuffed Cramer's other hand, and removed Cramer from the cell.

Once C.O. Bertram removed Cramer, he passed him to C.O. Frank. C.O. Frank then escorted Cramer twenty feet to the shower area to get Cramer "away from the situation." During their short walk, C.O. Frank asked Cramer "what had happened?" Cramer responded three times: "[Sherry] had a n[*****] baby." Soon after that statement, C.O. Frank locked Cramer in the shower area, which doubles as an extra holding unit, until the prison staff has a situation — like the present one — under control. Locked in the shower area, C.O. Frank instructed Cramer he "had to go over to the cell" to check on Sherry, which caused Cramer to blurt out "there's no sense checking on him, he's dead."

Cramer was right. Sherry was dead. After C.O. Frank removed Cramer from the cell area, C.O. Bertram spotted Sherry partially "on the floor at the corner of the bunk closest to the door." A sheet was tied around Sherry's neck, run through his mouth, and tied around the bunk. That same sheet enabled Sherry's head to hover 12-inches from the floor, face down. Bertram cut the sheet around Sherry's neck and lowered him the rest of the way to the floor with C.O. Frank's assistance, who had just come from the shower area.

Now on the floor, the corrections officers severed the bindings from Sherry's hands — which were behind his back — rolled his lifeless body over and discovered his feet were bound too. Next, C.O. Bertram worked to sever the foot bindings and C.O. Frank began chest compressions. The two officers alternated performing CPR until the medical team arrived. Unfortunately, the medical team could not save Sherry's life.

While these events transpired, Corrections Officer Christopher Alexander ("C.O. Alexander") stood between the shower area Cramer was locked-in and Cell 67 where Sherry was. At that distance, C.O. Alexander could hear Cramer —

despite the commotion in Cell 67 and the yelling of the other inmates — say: "[Y]eah, he is dead. I killed him."

Two weeks passed before a new twist took place. Namely, Cramer and fellow inmate John Teston ("Teston") found themselves being held next to each other in the DHU for a few days. Cramer was in Cell 37 and Teston in Cell 38. Because of the close proximity, the two inmates began to talk through the vents in their cells. Cramer initiated the rapport by asking Teston if he was white. Teston answered affirmatively and a lengthy six to seven hour conversation ensued.

During that long conversation, Cramer told Teston that he murdered Sherry. That it began as a physical altercation. That he strangled Sherry with a bed sheet. That he knocked him unconscious. That he "slapped him around some more," "made him kiss his boot by kicking him in the forehead" and ultimately hung Sherry. He did all this for one reason: Sherry "had a n[*****] baby[ ] and he was a n[*****] lover." Then Cramer informed Teston he would send him a letter.

And send him a letter he did. At suppertime, on August 17, 2012, hours after their extended chat, Teston received his meal tray as usual through his cell door's four-by-fifteen inch pie slot. What was unusual about this supper delivery, however, was it contained some reading material. A letter concealed under the tray addressed to "John" — which is Teston's first name. Teston read the letter. He read Cramer's detailed description of how he murdered Sherry and "why he had done it."

That letter says:

John[:]

Dude, what's up bro? Yeah that's [*sic*] crazy how they put you on suicide watch for nothing ! [*sic*] [B]ut yeah dude I don't and didn't want to talk about what happened the other week exspecially [*sic*] in the vent. I don't trust dude, exspecially [*sic*] when we gots them n[******] up above us!

[B]ut yeah dude, he was a half-breed, and he had a n[*****] baby he was cheating on this girl named Megan with a full blooded n[*****]! [T]here's 4 things I hate the most, a n[*****], a half-breed, a n[*****] lover, and some who associates with them. [B]ut anyways CO Frank,

- 4 -

good dude, one of us, he's a skin. [H]e came up to my cell earlier in the day, opened the door and came in, he gave me a can of chew and we bull shifted [*sic*] for a few. I guess Frank knew the dude from Ebensburg or some place, I don't know, but he said dude was a half-breed mongral [*sic*]. I was like yeah. [H]e was like yeah! So Frank punched the s[***] out of this dude. So we slapped him around for a few. (LOL). [T]hen we went on about our business. Well later on that night, dude tried to stab me with a unsharpened toothbrush, and while I was taking a s[***]. [H]e was f[******] me up on the shiner, punching[,] stabbing, p[****] s[***] he did. So I beat the n[*****] half-breed the f[***] up, tied him up, beat him some more, gave him a last word, made him kiss my boot and say the white man marches on, then threw him on the bed took a peace [*sic*] of sheet[,] strangled him, watched him die then I hung me a n[*****], you know I didn't intend to do it he just pushed the wrong buttons by sneaking me on the toilet.

So yeah dude. Rip this up and flush it, if and when you decide, I have a spot on the crew for you!

[Swastika symbol] Pearl Icings [Swastika symbol]

Shocked Cramer provided him with a written confession, Teston notified an officer he wanted to talk to either a supervisor or a state trooper about the letter he received. Corrections Officer Randall Baker ("C.O. Baker") consented and contacted Lieutenant Donald Ochenrider ("Lieutenant Ochenrider"), the shift commander. Next, Lieutenant Ochenrider, C.O. Baker, and C.O. Bertram traveled to Teston's cell and entered it.

Teston appeared nervous and asked if he could be removed from his cell "to another area where [he] could not be heard" because he "didn't want anybody to hear what [he] was saying" — especially Cramer. The corrections officers declined Teston's request. Teston then opened his hand and handed Lieutenant Ochenrider the letter. Lieutenant Ochenrider placed the letter in his pocket, exited Teston's cell with the other two officers, and headed back to his office. Once at his office, Lieutenant Ochenrider read the letter, realized he had information concerning Sherry's death, placed the letter in "a sealed bag, labeled it, and" locked it in a "contraband box in the administration area of the prison."

Before the next day's breakfast, Cramer contacted Teston again through the vent. In that conversation, Cramer told Teston that he wrote him another letter — a second letter — and that a block worker would deliver it. Sure enough, at breakfast, Teston received another letter from Cramer the same way he received the first — passed at a mealtime and hidden under a food tray. The contents and tone of the second letter, though, changed. Rather than describe how he murdered Sherry, Cramer directed his attention to Teston and Teston's failure to flush the letter. Not surprisingly, after reading the second letter, Teston felt threatened and feared both for himself and for his family. Soon afterwards, Teston gave Corrections Officer John Kirsch the second letter.

The second letter states:

What the f[***] dude! What the f[***] was you talking with the Lt and s[***] for last night? I know you f[******] told[,] dude. [*sic*] "I was listening in the vent"! [*sic*] What, you think this s[****] a joke? I trusted you! What the f[***] is your problem? I heard every word that was spoken in that cell, you f[******] Rat. Your [*sic*] playing a game that shouldn't be played. [*sic*] "What, did you give the letter to them, to"? [*sic*] [T]hat letter was supposed to be flushed down the toilet!. [*sic*] [T]hat Letter can get me booked for the rest of my life. What's Ms. Debbie going to think? [*sic*] When she finds you put her and the family in harms way. Man there was so much said about, in that letter.!. [*sic*] so much incriminating s[***]. You just don't understand do you? [Y]ou didn't only put me in a f[*****] up position, you put a fellow skin and his family in a f[*****] up position. [N]ow people are going to look at me, f[*****] up. [*sic*] asking questions as what type of dude I f[***] with and bring into or make a fellow skin. (dude, you f[*****] up)! [Y]ou crossed Lines. Lines that should [not] be crossed.

Over a month later, on September 24, 2012, Lieutenant Daniel Kearns ("Lieutenant Kearns") of the Pennsylvania State Department of Corrections transported Cramer, who was now no longer housed at the Cambria County Prison, to Mount Nittany Medical Center for testing. During their four hours together, Cramer volunteered some incriminating information. Specifically, Cramer stated: "[H]e had killed his cell mate [sic] in the Cambria County Jail." "[H]e tied him up, stabbed him, and choked him."

And he did it "because the guy had a biracial child." Cramer went on to say "he didn't care about telling" the State Corrections Officers who accompanied him that night "because he had already told the media."

On October 10, 11, and 14, 2013, a jury trial took place and the testimony of Coroner Dennis Kwiatkowski ("Coroner Kwiatkowski") and pathologist Dr. Curtis Steven Goldblatt ("Dr. Goldblatt") confirmed what Cramer told both Teston and the State Corrections Officers and the other evidence suggested: Cramer murdered Sherry. Coroner Kwiatkowski testified: "[T]he cause of death was manual strangulation, the manner of death would have been a homicide." Dr. Goldblatt testified: "This 28-year old white male prisoner died as a result of asphyxia secondary to ligature strangulation." In layman terms, that means when Sherry was strangled with the bed sheet, "the force produced by [the sheet] compress[ed] the blood flow to the brain." Once "the blood flow to the brain is blocked, the brain doesn't get enough oxygen." If "the brain doesn't get enough oxygen," then the person will die. And that is what happened to William Sherry.[1]

> [1] Suicide by hanging was an impossibility because of "the horizontal furrow that encircled the neck." Hangings have furrows that slant upwards because gravity suspends the body.

Consequently, on October 14, 2013, the jury convicted Cramer of: (1) Criminal Homicide — Murder in the First Degree, (2) Aggravated Assault, and (3) Assault by Prisoner.

Trial Court Opinion 1 (TCO1), 1/23/14, at 1-9 (citations to the record omitted).

The trial court sentenced Cramer to a mandatory term of life imprisonment for first degree murder, and a consecutive term of 45 to 90 months' imprisonment for assault by a prisoner. Cramer did not file post-sentence motions; instead, he filed a timely notice of appeal, as well as a timely Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court filed a Rule 1925(a) opinion on January 23, 2014.

- 7 -

On July 1, 2014, Attorney Gleason filed with this Court a petition to withdraw and an *Anders* brief.

"When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw." *Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) (quoting *Commonwealth v. Smith*, 700 A.2d 1301, 1303 (Pa. Super. 1997)).

> Prior to withdrawing as counsel on a direct appeal under *Anders*, counsel must file a brief that meets the requirements established by our Supreme Court in *Santiago*. The brief must:
>
> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.
>
> *Santiago,* 978 A.2d at 361. Counsel also must provide a copy of the *Anders* brief to his client. Attending the brief must be a letter that advises the client of his right to: "(1) retain new counsel to pursue the appeal; (2) proceed pro se on appeal; or (3) raise any points that the appellant deems worthy of the court[']s attention in addition to the points raised by counsel in the *Anders* brief." *Commonwealth v. Nischan,* 928 A.2d 349, 353 (Pa. Super. 2007), *appeal denied*, 594 Pa. 704, 936 A.2d 40 (2007).

*Commonwealth v. Orellana*, 86 A.3d 877, 880 (Pa. Super. 2014). After confirming that counsel satisfied these requirements, this Court must then

conduct its own review of the record and independently determine whether the appeal is in fact wholly frivolous. *Commonwealth v. Daniels*, 999 A.2d 590, 594 (Pa. Super. 2010).

Instantly, Attorney Gleason's *Anders* brief provides a detailed summary of the procedural history and facts of Cramer's case with citations to the record. It also includes a discussion of the four issues Cramer seeks to raise on appeal, and an explanation of Attorney Gleason's conclusion that an appeal on Cramer's behalf would be wholly frivolous. Attorney Gleason supports his rationale with citations to the record, as well as relevant case law. He has also certified in his petition to withdraw that he sent a copy of his *Anders* brief to Cramer. Attorney Gleason attached to his petition a letter he sent to Cramer advising Cramer of the rights enumerated in *Nischan*, 928 A.2d at 353. Therefore, we conclude that Attorney Gleason has complied with the above-stated requirements for withdrawal. Accordingly, we will now independently review the four issues Cramer seeks to raise herein, and also determine whether there are any other issues he could arguably present on appeal.

Cramer first seeks to challenge the sufficiency of the evidence to sustain his first degree murder conviction. Specifically, he avers that the Commonwealth failed to prove he killed Sherry "in an intentional, deliberate, and premeditated manner." *Anders* Brief at 22 (quoting 18 Pa.C.S. § 2502(d)). We disagree. Our Supreme Court has stated that "the period of reflection required for premeditation to establish the specific intent to kill

'may be very brief; in fact the design to kill can be formulated in a fraction of a second.'" ***Commonwealth v. Rivera***, 983 A.2d 1211, 1220 (Pa. 2009). Here, according to Cramer's own words in his letter to Teston, he beat Sherry, tied him up, and beat him some more. ***See*** TCO1 at 5-6 (quoting Commonwealth's Exhibit 29). Cramer then paused his attack to give Sherry "a last word," and "made [Sherry] kiss [his] boot and say the white man marches on" before strangling Sherry with a bed sheet. ***Id.*** This evidence demonstrates that Cramer killed Sherry in an intentional, deliberate, and premeditated manner. Accordingly, we agree with counsel that Cramer's attack on the sufficiency of the evidence to sustain his first degree murder conviction is frivolous.

Next, Cramer seeks to challenge the court's denial of his pretrial motion to suppress.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

***Commonwealth v. Spieler***, 887 A.2d 1271, 1274-1275 (Pa. Super. 2005) (citations omitted).

- 10 -

In Cramer's motion to suppress, he sought to exclude several statements he made to corrections officers around the time of Sherry's murder, arguing that the statements were "the product of custodial interrogation" that was not preceded by *Miranda* warnings.[1] This Court has explained:

> A law enforcement officer must administer *Miranda* warnings prior to custodial interrogation. *Commonwealth v. Johnson*, 373 Pa. Super. 312, 541 A.2d 332, 336 (Pa. Super. 1988). The standard for determining whether an encounter with the police is deemed "custodial" or police have initiated a custodial interrogation is an objective one based on a totality of the circumstances, with due consideration given to the reasonable impression conveyed to the person interrogated. *Commonwealth v. Gwynn*, 555 Pa. 86, 723 A.2d 143, 148 (1998). Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Johnson*, 541 A.2d at 336 quoting *Miranda…,* 384 U.S. [at] 444…. "Interrogation" is police conduct "calculated to, expected to, or likely to evoke admission." *Id.* [(]quoting *Commonwealth v. Simala*, 434 Pa. 219, 226, 252 A.2d 575, 578 (1969)[)]. When a person's inculpatory statement is not made in response to custodial interrogation, the statement is classified as gratuitous, and is not subject to suppression for lack of warnings. *Id.*

*Commonwealth v. Baker*, 24 A.3d 1006, 1019 (Pa. Super. 2011) (quoting *Commonwealth v. Mannion*, 725 A.2d 196, 200 (Pa. Super. 1999)).

We will address each of Cramer's challenged statements in turn, beginning with a statement he made to C.O. Bertram. To reiterate, C.O. Bertram responded to Cramer and Sherry's cell to investigate the yelling

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

that the officers heard over the cell's intercom system. When C.O. Bertram arrived at the cell, he found Cramer standing at the door, blocking the officer's view inside the cell's interior. C.O. Bertram instructed Cramer to move aside, at which point Cramer said, "get this molester out of my cell, what did you put him in here for?" **See** Trial Court Opinion 2 (TCO2), 9/4/13, at 17 (opinion accompanying trial court's order denying Cramer's motion to suppress). Cramer contended in his suppression motion that this statement should be excluded because he had not been provided with **Miranda** warnings before making this comment.

The trial court, however, concluded that Cramer's statement was gratuitous and, thus, no **Miranda** warnings were required. We agree. Cramer's statement was not made in response to any comment or question by C.O. Bertram that was "calculated to, expected to, or likely to evoke admission." **Baker**, 24 A.3d at 1019 (citation omitted). Instead, it was an unforeseen and arbitrary response to the officer's order that Cramer move aside from the cell door's window. Accordingly, Cramer's claim that the trial court erred by not suppressing this statement is frivolous.

The next statements Cramer challenged in his pretrial motion to suppress were those he made to C.O. Frank after C.O. Bertram had handcuffed Cramer and removed him from the cell. **See** TCO2 at 18. At the suppression hearing, C.O. Frank testified that as he approached the cell, he could not see inside because C.O. Bertram was blocking his view. N.T. Suppression Hearing, 6/25/13, at 10. C.O. Frank was directed to escort

Cramer to the shower area and, as the officer did so, he asked Cramer, "what happened?" *Id.* at 13. Cramer responded by stating, "he had a n[*****] baby...." *Id.* at 9. Cramer repeated this same statement three times. *Id.*

Again, the trial court found Cramer's three statements "were gratuitous" and were not provided during a custodial interrogation. TCO2 at 25. That determination is supported by the record. C.O. Frank responded to an emergency situation and asked Cramer "what happened" before the officer even knew that a crime had occurred. As far as C.O. Frank knew, Cramer was not a suspect in any offense when the question was posed to Cramer, and nothing indicates the officer intended to elicit an incriminating response. Therefore, the court did not err in concluding that these three statements by Cramer were not the product of a custodial interrogation. *See Commonwealth v. Umstead*, 916 A.2d 1146, 1152 (Pa. Super. 2007) (holding that a corrections officer's asking an inmate if he witnessed an assault on another inmate, and "what happened," did not constitute an interrogation; the inmate questioned "was not a suspect when the questioning occurred, nor was he asked to disclose facts linking himself to the attack....").

Next, Cramer asked the court to suppress his statements to C.O. Frank that "[t]here is no sense in checking on him. He is dead." N.T. Suppression Hearing at 10. C.O. Frank testified at the suppression hearing that Cramer made these statements after the officer "told him to stand by until we went

over and checked on … [Sherry]…." ***Id.*** at 14. The trial court concluded that Cramer's statements were not made during the course of an interrogation. Once again, we agree. C.O. Frank's comment to Cramer to "stand by" while they checked on Sherry was not a question, and nothing indicated that C.O. Frank's directive was "calculated to, expected to, or likely to evoke admission." ***Baker***, 24 A.3d at 1019 (citation omitted). Accordingly, the trial court did not err in denying Cramer's motion to suppress these statements.

Finally, we ascertain no error in the trial court's decision not to suppress a statement made by Cramer to C.O. Alexander. C.O. Alexander was asked to keep watch outside the shower area where Cramer was detained "and note anything Cramer may say." TCO2 at 22. After Sherry was pronounced dead, Cramer stated: "There goes the rest of my life, I'm only twenty-one years old." ***Id.*** at 23. Because these comments were not made in response to any question or statement by C.O. Alexander, they were not proffered during an interrogation.

In sum, having reviewed each of the statements Cramer challenged in his motion to suppress, we conclude that none of them were made during the course of a custodial interrogation. Rather, they were gratuitous and, as such, ***Miranda*** warnings were not required. Thus, the trial court did not err in denying Cramer's motion to suppress.

In Cramer's third issue, he avers that the trial court improperly admitted "certain photographs of Sherry's dead body that were possibly

- 14 -

prejudicial due to their depiction of the injuries to Sherry." ***Anders*** Brief at

25. Our Supreme Court has explained:

> We will affirm a trial court's admission of photographs absent an abuse of discretion. Further,
>
>> When considering the admissibility of photographs of a homicide victim, which by their very nature can be unpleasant, disturbing, and even brutal, the trial court must engage in a two-step analysis:
>>
>>> First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

***Commonwealth v. Johnson***, 42 A.3d 1017, 1033-1034 (Pa. 2012)

(citations omitted).

> In this case, the trial court found the photographs admissible, stating:
>
>> In the instant matter, the photographs satisfy both steps of the two-step analysis – even though the satisfaction of one step would suffice to deny Cramer's Motion. First, the photographs are not inflammatory. Exhibit #37 depicts a close up of the horizontal furrow from the front and Exhibit #38 provides a close up of the contusions on Sherry's face that were "consistent with the edge of an object" and not a fist. Both photographs demonstrate unpleasant images of Sherry's injuries in a homicide case but unpleasantness is not enough. The photographs must "inflame the minds and passions of the jury." These images do not. They are simply documentation of the neck and facial injuries Sherry received.
>>
>> Second, even if the Court assumes the photographs are inflammatory, their evidentiary value "outweighs the likelihood that the photograph[s] will inflame the minds and passions of the jury." Dr. Goldblatt testified that a suicide hanging was an impossibility because a horizontal furrow was present on

Sherry's neck as opposed to a furrow that slanted upwards. Exhibit #37 illustrates this analysis. Dr. Goldblatt also testified the contusions on Sherry's face suggest he was hit "with the edge of an object" and not a fist. And Exhibit #38 demonstrates that analysis. Consequently, if the Commonwealth uses the photographs to not only make sense of a witness's testimony but also [to] corroborate it,[6] then their evidentiary value supersedes any inflammatory effect.

[6] As the Court noted [previously]…, not only do the photographs corroborate Dr. Goldblatt's testimony but they also lend credibility to Teston's testimony and Cramer's first letter.

TCO1 at 13.

We ascertain no error in the trial court's determination that the at-issue photographs were admissible for the reasons stated above. In particular, we have reviewed the pictures and agree with the court that they are not inflammatory. They depict Sherry's face from the front and side, and show cuts and scrapes that are not overly gruesome. **See** Commonwealth's Exhibits 37, 38. While the court is correct that the images are unpleasant, it is also correct that they do not rise to the level of being inflammatory. Accordingly, the court did not err in admitting this evidence.

In Cramer's fourth and final issue, he seeks to challenge the trial court's discretion in imposing a term of 45 to 90 months' imprisonment *consecutive* to his sentence of life imprisonment. However, Cramer has waived this claim by failing to file a post-sentence motion asserting it before the trial court. **See Commonwealth v. Bullock**, 948 A.2d 818 (Pa. Super. 2008) (stating the right to appeal a discretionary aspect of sentence is not absolute and is waived if the appellant does not challenge it in post-sentence

- 16 -

motions or by raising the claim during the sentencing proceedings). Accordingly, Cramer's final issue is frivolous.

In sum, each of the issues Cramer seeks to raise on appeal is frivolous, and our review of the record has revealed no other issue(s) he could assert herein. Consequently, we affirm Cramer's judgment of sentence and grant Attorney Gleason's petition to withdraw.

Judgment of sentence affirmed. Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/2/2014