J-S79001-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RAFAEL RODRIGUEZ, | |
| Appellant | No. 1184 EDA 2012 |

Appeal from the Judgment of Sentence entered April 16, 2012,
in the Court of Common Pleas of Philadelphia County,
Criminal Division, at No(s): CP-51-CR-0009958-2010

BEFORE:  ALLEN, OLSON, and STRASSBURGER*, JJ.

MEMORANDUM BY ALLEN, J.:                    **FILED DECEMBER 16, 2014**

Rafael Rodriguez ("Appellant") appeals *pro se*[1] from the judgment of sentence imposed after a jury convicted him of first-degree murder, conspiracy to commit murder, possessing an instrument of crime, and a violation of the Uniform Firearms Act.  We affirm.

Appellant presents a single issue for our review[2]:

---

[1] Upon remand from this Court, on October 18, 2013, the trial court conducted a hearing pursuant to **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998), after which it determined that Appellant's request to proceed *pro se* was knowing, intelligent and voluntary.

[2] Although the trial court issued an opinion, it did not require compliance with Pa.R.A.P. 1925 and Appellant did not file a Pa.R.A.P. 1925(b) concise statement.

*Retired Senior Judge assigned to the Superior Court.

> I. WHETHER THE LOWER COURT ERRED AS A MATTER OF LAW/OR ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION TO SUPPRESS STATEMENTS, AS THE STATEMENTS WERE THE FRUIT OF AN UNLAWFUL SEIZURE AND, SEPARATELY, SAID STATEMENTS WERE OBTAINED IN VIOLATION OF MIRANDA V. ARIZONA, 384 U.S. 436 (1966)?

Appellant's Brief at 4.

Our scope and standard of review is well settled:

> An appellate court's standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. [Because] the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Reese*, 31 A.3d 708, 721 (Pa. Super. 2011) (citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." *Commonwealth v. Elmobdy*, 823 A.2d 180, 183 (Pa. Super. 2003) (citations omitted). "We are bound by the suppression court's factual findings, if supported by the record; however, the question presented—whether a seizure occurred—is a pure question of law subject to plenary review." *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014).

The trial court observed that it conducted "a lengthy suppression hearing concerning Appellant's statement []." Trial Court Opinion, 6/20/13, at 5. Our review of the notes of testimony from the suppression hearing reveal the following: Philadelphia Narcotics Sergeant Jeffrey Seaman testified to the circumstances leading to Appellant's arrival at the Homicide Unit for questioning regarding the murder of the victim, Julio Augustine. Sergeant Seaman testified that he was executing a search warrant on a property where Appellant was located. N.T., 4/11/12, at 4-5. Sergeant Seaman stated:

> After we concluded our narcotics investigation, I told [Appellant] that homicide investigators were interested in speaking with him concerning a homicide and I asked him if he would be willing to go down to Homicide and talk to the investigators.

*Id*. at 5. Sergeant Seaman testified that Appellant's freedom was not restricted "in any way" and, "At that time we were outside the property. We had served another search warrant across the street. And we had a couple of people that Homicide was interested in talking with and I asked them if they wanted to go down and they said yes. I drove them down." *Id*. at 6.

Philadelphia Homicide Detective Timothy Scally testified to investigating the murder of Julio Augustine. Detective Scally stated that he interviewed Santa Rosario, who, at the time and near the scene of the murder, heard "several gunshots" and "saw [Appellant] soon after that." N.T., 4/10/12, at 56. Ms. Rosario "drew a picture of the male she saw come off the street and she wanted to give that to [detectives] and tell [the

detectives] what she saw." *Id*. Ms. Rosario also identified Appellant from a photo array. *Id*. at 59. Detective Scally advised "officers in the neighborhood, if they saw [Appellant], [Detective Scally] would like to talk to him." *Id*. at 60. Detective Scally's supervisor, Sergeant McClain, subsequently contacted Detective Scally at home to tell him Appellant was at the Homicide Unit, and gave Detective Scally and Detective Nordo "permission to come in early the next day at 6 a.m." to talk with Appellant. *Id*. at 63, 69, 76. Detective Scally testified that he wanted to speak with Appellant because he "was on the block at the time when the shooting occurred." *Id*. at 64. When Detective Scally arrived at the Homicide Unit, he met with Appellant in an interview room and advised Appellant that he wanted to discuss "a shooting in the neighborhood." *Id*. at 63-64. Detective Scally testified that he gave Appellant *Miranda* warnings because:

> He denied knowing of any shooting or anybody being murdered. At that point I knew that had to be a lie, and myself and Detective Nordo, we verbally gave him his warnings at that point.

*Id*. at 65. Detective Scally testified "at this point" he "ruled [Appellant] out as an eyewitness of sorts." *Id*. Detective Scally then "went back to [the neighborhood] to prove [Appellant] wrong. … [Detective Scally] conducted another interview or talked to some other people about what was going on. Then another witness came in who was eventually interviewed who backed up what [the] original witness [Ms. Rosario] said about [Appellant]." *Id*. at 66.

- 4 -

On cross-examination, Detective Scally confirmed that Appellant "was originally brought in as a witness." *Id*. at 72-73. Detective Scally stated:

> I – just like I said, I introduced myself. I tell [Appellant] why he is here. And at that point he denies to me knowing anybody being shot, doesn't know who [the victim] is, doesn't know anything, and that's when we read him his rights.
>
> ***
>
> All I asked him was did he know about a shooting and did he know [the victim]. And he denied both.

*Id*. at 77, 78-79. Detective Scally then left to further investigate. *Id*. at 79. He returned several hours later to interview Appellant, and during that second encounter, Appellant gave his statement. *Id*. at 81-82.

Philadelphia Homicide Detective Phillip Nordo corroborated Detective Scally's testimony that the detectives were not working when Appellant was first brought to the police station, but arrived early for their shift at 6:00 a.m. because Appellant "came in" to the Homicide Unit. *Id*. at 87-88. Detective Nordo stated:

> When we came in, we introduced ourselves. Basically, told him exactly why he is here. Told him what we're investigating. Just introductory, that's basically it, really. Asked him if he knows anything about what happened, did you hear about the crime, stuff like that. … His response was, I don't know a thing. I wasn't around during that time period and I know nothing about any such murder.

*Id*. at 88-89. Detective Nordo testified that after Appellant denied knowledge of the murder, he was ***Mirandized***, and Detective Nordo had no further contact with Appellant until later that afternoon. *Id*. at 89, 92.

Detective Nordo explained that the detectives "were finding and interviewing other witnesses involved in this case. So we were talking to other potential witnesses." *Id*. at 90. After being read his rights, Appellant signed and dated the notice of his Miranda rights. *Id*. at 92-94, 123.

On cross-examination, Detective Nordo testified:

Once we got the "no" to everything about the, No, I wasn't on the block, no, I don't know who [the victim] is, no, I don't know what murder you're speaking of, I think it was safe to say that at that point, that's when we said to [Appellant], you have a right to remain silent.

*Id*. at 113. Detective Nordo stated that after reading Appellant his *Miranda* warnings, he had "no further conversation" with Appellant "because [Appellant] didn't have anything further to say." *Id*. at 114, 116-117. It was not until Detective Nordo returned several hours later that day and had "further contact later on that afternoon" that he again *Mirandized* Appellant and took his written statement. *Id*. at 89-92; Commonwealth Exhibit C-M3.

Appellant offered testimony that was contrary to the testimony presented by the Commonwealth. Appellant testified that during the narcotics search, he was "placed in handcuffs" and then "placed in an unmarked car" and told he was "going down to the district." *Id*. at 15. Appellant maintained throughout his testimony that while at the Homicide Unit, he was not feeling well and was suffering side effects from diabetes. *See, e.g., id*. at 23 ("I just kept telling everyone that I was diabetic."). Appellant stated that Detective Nordo came to speak to him and told him he

was looking for two individuals and asked Appellant whether he wanted to help. *Id*. at 20-21. Appellant said that he told Detective Nordo that he knew the individuals from the area but "didn't know anything of them." *Id*. at 21. Appellant testified that Detective Nordo did not advise him of his *Miranda* rights, but delivered him "back in the holding cell." *Id*. at 22. Specifically, the following exchange occurred between Appellant and his counsel:

> COUNSEL: At that point in time did he advise you of any rights?
>
> APPELLANT: No.
>
> COUNSEL: Did he tell you you had a right to an attorney, you didn't have to speak?
>
> APPELLANT: No.
>
> COUNSEL: Anything that you said could be used against you?
>
> APPELLANT: No.
>
> COUNSEL: Did he take out a card or anything and read from it to you?
>
> APPELLANT: No, sir.
>
> COUNSEL: Fair to say after that he left the room?
>
> APPELLANT: No. He placed me back in the holding cell.

*Id*. at 22.

Appellant testified that Detective Nordo subsequently returned and "starts questioning me about the same thing; that he wanted to know about two individuals." *Id*. at 25. Appellant did not "recall any paperwork at all."

*Id*.   Appellant asserted he was not feeling well, and did not remember signing anything.   *Id*. at 26-27.   When asked about the signature of his name on the *Miranda* form, Appellant denied signing it.   *Id*. at 27.

On cross-examination, Appellant maintained that he was handcuffed and transported to the police station.   *Id*. at 36.   He testified that the police asked him about two individuals named James and Lito and what Appellant knew about them.   *Id*. at 42-44.   Appellant described "those words" in his signed statement presented by the Commonwealth as Exhibit C-M3 as "completely false."   *Id*. at 47.   Appellant continued to maintain that he had been in a state of diabetic weakness.   *See, e.g., id*. at 39 ("I told them I was diabetic; I need to see a nurse.").

At the conclusion of the above testimony, the trial court made findings which included the following:

> [Appellant] denied being at the scene or knowing the decedent or having any information about the killing.  At that time the detectives had no reason to believe that [Appellant] had any involvement in the crime or was anything more than a witness to the crime; however, as the statement was inconsistent with Ms. Rosario's statement, the detectives read [Appellant] his Miranda warnings.  No further questioning occurred at that time, nor did [Appellant] indicate that he wished to see an attorney or wished to remain silent.

> [] [Appellant] was kept in Homicide.

> As the officers conducted further interviews in the morning and early afternoon, [Appellant] was not interviewed, nor did he advise anyone that he was in any medical distress.

[T]he results of those interviews were consistent with the statement of Ms. Rosario and inconsistent with the denials of [Appellant].

The detectives returned to the Homicide Unit at approximately 3:30 p.m. Detective Nordo and [his partner] then read [Appellant] his Miranda rights. [Appellant] indicated that he wished to waive his rights and gave a statement.

The Commonwealth's exhibit … is a true and correct copy of [Appellant's] statement.

At no time prior to giving the statement did [Appellant] advise the police that he was diabetic or was in any medical distress from his condition.

\*\*\*

***[Appellant] testified at the motion to suppress. His testimony, as found by this Court, was wholly unworthy of belief***.

N.T., 4/11/12, at 203-209 (emphasis added).

On appeal, Appellant challenges the admission of his statements to Philadelphia Police Detective Phillip Nordo. Appellant first argues that he was "unlawfully seized" and "subjected to an investigatory detention which was not supported by reasonable suspicion or probable cause." Appellant's Brief at 11. Appellant additionally argues that he was subjected to continued police interrogation "even after responding to his Miranda warnings by stating he had 'nothing to say.'" ***Id***.

Given that the trial court's factual findings are supported by the record, ***Reese, supra***, and the trial court found Appellant's testimony "wholly unworthy of belief", we find no merit to Appellant's claim that his statement was "the fruit of an unlawful seizure" and in violation of his

*Miranda* rights. Appellant's appellate argument essentially challenges the trial court's factual findings and credibility determinations. For instance, Appellant claims "there was an absence of either reasonable suspicion or probable cause, making his initial seizure and later investigatory detention unreasonable." Appellant's Brief at 9. However, the trial court found the testimony presented by the Commonwealth to be credible. Sergeant Seaman testified that Appellant's freedom was not restricted "in any way" and that Appellant agreed to go to the police station for questioning. N.T., 4/11/12, at 6. Sergeant Seaman testified, "[W]e had a couple of people that Homicide was interested in talking with and I asked them if they wanted to go down and they said yes. I drove them down." *Id*. Sergeant Seaman's testimony indicates that Appellant was not "seized."

Further, when Detective Scally initially spoke with Appellant, Detective Scally wanted to speak with Appellant because Appellant "was on the block at the time when the shooting occurred." N.T., 4/10/12, at 64; *Commonwealth v. Garvin*, 50 A.3d 694, 698 (Pa. Super. 2012) (not every statement made by an individual during a police encounter constitutes an interrogation). It is well settled that *Miranda* is not implicated unless an individual is in custody *and* subject to interrogation. *See Commonwealth v. Umstead*, 916 A.2d 1146, 1149-52 (emphasis added). Even if Appellant was in custody, once Appellant denied knowledge of the shooting, and Detective Scally perceived Appellant was lying, Detective Scally gave Appellant *Miranda* warnings. N.T., 4/10/12, at 65. Detective Scally

- 10 -

*Mirandized* Appellant "at that point" because he realized that any further conversation with Appellant could evoke an admission. *Id*.; *Garvin*, 50 A.3d at 698 ("Interrogation is police conduct calculated to, expected to, or likely to evoke admission."). In *Umstead*, 916 A.2d at 1152, this Court expressly rejected appellant's assertion that *Miranda* warnings are necessary in every instance where an individual who is in police custody is questioned by a law enforcement officer "regarding a crime." We determined in *Umstead* that *Miranda* warnings were not required because the appellant "was simply asked if he witnessed the assault." *Id*. Similarly, in the instant case, Detective Scally "simply" advised Appellant that he wanted to talk with him about the shooting. N.T., 4/10/12, at 64.

Appellant additionally argues that his inculpatory statement in the afternoon, "even though given after Miranda warnings, should have been suppressed because it was tainted by the initial illegality of his seizure and derivative detention." Appellant's Brief at 9. Appellant asserts that he gave his statement only after being subjected to "continuing police interrogation until he agreed to waive his Miranda rights and provide a statement." *Id*. at 10. Again, Appellant's version of events is contrary to the factual findings of the trial court, which are supported by the record. The evidence presented by the Commonwealth was that Appellant was not illegally seized or detained because he agreed to go to the police station to talk with homicide detectives, and although ultimately he was subjected to a custodial

interrogation, Appellant gave his statement only after he was read and waived his *Miranda* rights.

The testimony presented by the Commonwealth was that Appellant, when first questioned by Detective Scally, denied any knowledge of the murder in the neighborhood, which led Detective Scally to believe that Appellant was lying and prompted Detective Scally to give Appellant verbal *Miranda* warnings. N.T., 4/10/12, at 65, 89. Both Detective Scally and Detective Nordo testified that when they returned several hours later to question Appellant, they again advised him of his *Miranda* rights, and Appellant executed a written waiver. *Id*. at 91-93. Detective Nordo expressly testified that he read Appellant his rights. *Id*. at 92-94. With regard to Appellant's statement, Detective Nordo testified that he was "questioning and typing; whatever [Appellant's] answer was, I would type it down." *Id*. at 96. Detective Nordo testified that Appellant reviewed the statement. *Id*. at 108-109. The trial court accepted this testimony and we are bound by it. *Commonwealth v. Sepulveda*, 855 A.2d 783, 789 (Pa. 2004).

Although there was a delay of several hours from when the homicide detectives first encountered Appellant, and when they questioned him about the murder, Appellant in both instances received *Miranda* warnings, first verbally and later both verbally and in writing. The trial court determined that under the totality of the circumstances presented by the Commonwealth, Appellant's statement was voluntary. *Sepulveda, supra*,

at 793 (statement voluntarily given six hours after appellant's arrest but before his arraignment where the appellant was informed of his constitutional rights before he spoke with officers, and nothing in the record indicated that delay was "aimed at overcoming Appellant's will, or that the police utilized any coercive tactics to persuade him to give a statement"). *See also Commonwealth v. Page*, 59 A.3d 1118, 1132-33 (Pa. Super. 2013) (appellant knowingly and intelligently waived his *Miranda* rights when he signed a form and orally acknowledged that he understood his rights; the determination of whether an accused has knowingly and voluntarily waived his constitutional rights depends on the facts of each particular case).

Here, the record supports the trial court's conclusion that Appellant's statement "was knowingly, intelligently and voluntarily given after being given and waiving his Miranda rights." N.T., 4/11/12, at 209. Upon review, we discern no error in this conclusion. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judge Strassburger joins the memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/16/2014