J-A27002-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL RAYMOND BELL | |
| Appellant | No. 3399 EDA 2018 |

Appeal from the Judgment of Sentence imposed August 1, 2018
In the Court of Common Pleas of Montgomery County
Criminal Division at No: CP-46-CR-0006944-2017

BEFORE:  STABILE, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.:                **FILED:  FEBRUARY 22, 2021**

Appellant, Michael Raymond Bell, appeals from the judgment of sentence imposed on August 1, 2018[1] in the Court of Common Pleas of Montgomery County, following Appellant's convictions of first-degree murder, possession of instruments of crime ("PIC"), and tampering with evidence.[2]

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Appellant purported to appeal from the November 2, 2018 order denying his post-sentence motion.  "In a criminal action, an appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions." **Commonwealth v. Rivera**, 238 A.3d 482, 489 n.1 (Pa. Super. 2020) (quoting **Commonwealth v. Shamberger**, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (_en banc_) (citation omitted)).  We have corrected the caption accordingly.

[2] 18 Pa.C.S.A. §§ 2502(a), 907, and 4910, respectively.

Appellant contends the trial court erred in denying his motion to suppress and in refusing to deliver a requested jury instruction. Following review, we affirm.

As the trial court explained:

At approximately 8:13 p.m. on Saturday, September 23, 2017, Norristown Police officers responded to a call that there was a dead body inside of Appellant's apartment at the Riverside Apartment complex on Schuylkill Avenue in Norristown. Upon their arrival, the officers encountered three individuals in the parking lot: Appellant, Appellant's girlfriend Kaitlin Oberreither, and friend Marquis Allen. Appellant escorted the officers to his apartment, at which time one of the officers took the keys from Appellant to open the door for safety reasons. Upon entry, the officers discovered a black male lying on the floor next to a couch in the living room area with a large amount of blood. After officers gathered preliminary information, all three witnesses agreed to go to the police station to give a statement. After providing three inconsistent statements to detectives, at approximately 12:45 a.m. on September 24, 2017, Appellant confessed to killing the victim, Leroy McCray ("McCray") with a hammer.

Appellant provided detectives with several consents to search and also consented to provide a videotape statement. Starting at approximately 2:26 a.m. on September 24, 2017, Appellant provided a videotape statement, lasting approximately five (5) minutes depicting his version of how the killing occurred in his apartment. Law enforcement arrested Appellant and charged him with McCray's murder on September 24, 2017.

Trial Court Opinion, 1/14/20, at 2-3 (citations to notes of testimony, trial exhibits, and criminal complaint omitted).[3]

---

[3] Appellant concedes that "[t]he facts and procedural history preceding this appeal are undisputed and, excepting the trial court's conclusions drawn from such facts, [are] correctly summarized in the trial court[']s 1925(b) Opinion." Appellant's Brief at 6.

Appointed counsel filed a motion to suppress statements made and consents given by Appellant, contending that detectives subjected Appellant to a custodial interrogation before reading Appellant his *Miranda*[4] rights. The motion sought suppression of Appellant's statements, "including but not limited to his video confession, and any consents to search," as well as evidence gathered as a result of his statements because the evidence constituted "fruit of the poisonous tree." Motion to Suppress, 3/12/18, at 9-10.

The trial court conducted a hearing on March 19, 2018 to address all pre-trial motions except motions *in limine*. With respect to the motion to suppress, on May 3, 2018, the court issued its Findings of Fact and Conclusions of Law as well as an order denying Appellant's motion.[5] The case proceeded to trial the following day, with voir dire taking place on May 4 and opening statements beginning on May 7.[6] On May 11, 2018, the jury found Appellant guilty of murder, PIC, and tampering with evidence.

The trial court directed a presentence investigation and a parole and probation intervention evaluation before sentencing Appellant on August 1,

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] The court's 28-page Findings of Fact and Conclusions of Law included 76 factual findings and 40 legal conclusions. Findings of Fact and Conclusions of Law, 5/3/18.

[6] The trial court disposed of several motions *in limine* and other pre-trial matters by orders issued on April 30 and May 2, 2018.

2018, to a mandatory life sentence without parole for murder, a concurrent sentence of two and a half to five years' incarceration for PIC, and a determination of guilty without further punishment for tampering with evidence. Appellant filed post-sentence motions, which were denied on November 2, 2018. This timely appeal followed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant asks this Court to consider two issues:

I.    Whether the court should have suppressed the Appellant's statements because such statements were not voluntarily provided due to the manipulative police interrogation.

II.   Whether the trial court erred by failing to instruct the jury on the castle doctrine justification defense.

1. Whether the castle doctrine justification should have been provided because a forceful entry does not require a physical breaking into a person's residence[.]

2. Whether the castle doctrine justification should have been provided because there was no criminal activity occur[r]ing at the time deadly force was used related to the confrontation.

3. Whether the court's omission of the castle doctrine justification jury instruction resulted in prejudice to the Appellant because he was not provided with the presumption that deadly force was necessary.

Appellant's Brief at 5.[7]

_____

[7] We have reordered Appellant's issues for ease of disposition.

In his first issue, Appellant argues that evidence obtained as a result of his statements should have been suppressed because of the manipulative interrogation conducted by police before reading him his *Miranda* rights. As this Court recently reiterated:

> When we review the ruling of a suppression court we must determine whether the factual findings are supported by the record. When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.

*Commonwealth v. Copenhaver*, 238 A.3d 509, 513 (Pa. Super. 2020) (quoting *Commonwealth v. Hicks*, 208 A.3d 916, 925 (Pa. 2019) (citation omitted)). "Our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing." *Copenhaver*, 238 A.3d at 513 (quoting *Commonwealth v. Rapak*, 138 A.3d 666, 670 (Pa. Super. 2016) (alteration and additional citation omitted)).

Further:

> Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa. Super. 2017) (quoting *Commonwealth v. Jones*, 121 A.3d 524, 526-27 (Pa. Super. 2015) (alterations and additional citations omitted)).

The crux of Appellant's argument is that his pre-*Miranda* statements should be suppressed because of manipulative police conduct, and the statements made after he was provided *Miranda* warnings should be suppressed because they constituted fruit of the poisonous tree. Having reviewed the evidence presented by the prosecution at the suppression hearing, including the testimony of the officers involved, we find the record supports the trial court's factual findings. We hereby incorporate those findings as if fully set forth herein. Findings of Fact, 5/3/18, at ¶¶ 1-76. Further, we find that the court properly applied the law to the facts to reach its conclusions of law, specifically in determining that Appellant was not in custody at the time he gave the first three parts of his written statement and in determining that Appellant voluntarily waived his rights before providing the fourth part of the written statement and a videotaped statement. We hereby incorporate the trial court's conclusions of law herein as if fully set forth. Conclusions of Law, 5/3/18, at ¶¶ 1-39. Because the trial court properly denied Appellant's motion to suppress, we shall not disturb its ruling. Appellant's first issue fails for lack of merit.

In his second issue, Appellant asserts trial court error for failure to deliver an instruction regarding the castle doctrine defense. Appellant argues that "the errors of the court result from the court's conclusion that a physical breaking and entering is required to fulfill the [prerequisite condition

warranting a castle doctrine instruction] under 18 Pa.C.S.A § 505(b)(2.1)(i)[.]" Appellant's Brief at 23.

For context, it is helpful to consider Appellant's statement to Detective Richard, describing the events that occurred when McCray arrived at Appellant's apartment between 7:00 a.m. and 8:00 a.m. on the morning of September 23, 2017. The trial court provided a summary of that statement as follows:

> I was in my bedroom putting on lotion and I heard my door open, so I came out there and [McCray] was standing in my living room, looking goofy. I asked him what he was doing. I was like, you didn't even call me and tell me that you were going to show up. He was fine at first, but then once I told him that he had to leave, that's when he got like really belligerent and started cursing and using foul words. He was telling me he was going to kick my ass. I told him to just leave. When I told him that, he got in my face, and I asked him to take a step back. I asked him again and he pushed me, so I pushed him back. That's when he started swinging on me. I did what I thought was right. There was a hammer sitting right there, and I just grabbed the hammer and I hit him. Something came over me, and I just hit him.

> * * *

> Question: How long did it take for him to die?

> Answer: About five minutes.

> Question: After he died, did you move his body?

> Answer: Yes. I moved him onto the couch. I don't even know why; I just did. I wanted to make it look like he was asleep or something.

> * * *

> Question: How did he just walk into your apartment? Was your door unlocked?

Answer: No. Apparently he must have made a spare key.[8]

Trial Court Opinion, 1/14/20, at 16-17 (quoting N.T., Trial, 5/7/18, at 246-50; Photocopy of Appellant's Statement, Commonwealth Exhibit C-19; and N.T., Trial, 5/8/18, at 23-26, 30).

With respect to our standard of review, in **Commonwealth v. Cannavo**, 199 A.3d 1282 (Pa. Super. 2018), this Court explained:

> Our standard of review in regard to a trial court's decisions on jury instructions is well-settled: "[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." **Commonwealth v. Galvin**, 603 Pa. 625, 651, 985 A.2d 783, 788-89 (2009). "[Our] key inquiry is whether the instruction on a particular issue adequately, accurately and clearly presents the law to the jury, and is sufficient to guide the jury in its deliberations." **Commonwealth v. Hamilton**, 766 A.2d 874, 878 (Pa. Super. 2001). Appellate review of a court's decision as to whether the castle doctrine is applicable, however, is less clear.

**Id.** at 1286.

In **Cannavo**, the Court explained:

> The castle doctrine was formalized into statute by our legislature in 2011. Since that time, the trial court and the parties agree there has been sparse case law addressing the applicability of the castle doctrine. Our Supreme Court in 2016, however, provided some clarity on the application of the castle doctrine in **Commonwealth v. Childs**, 636 Pa. 322, 142 A.3d 823 (2016).

---

[8] In a text message sent by McCray to Appellant at 9:14 p.m. on the night before the murder, McCray stated, "I got a key to open the door down stairs so I let myself in." Appellant texted back, "Ok." Exhibit B to Commonwealth Motion *in Limine* to Admit Text Messages, 4/16/18. That motion was granted as unopposed by order entered on April 30, 2018.

In ***Childs***, although the primary issue was whether the defendant was entitled to a castle-doctrine instruction when his trial took place after enactment of the castle-doctrine statute, but the act took place before enactment of the statute, our Supreme Court noted that the Section 505(b)(2.1) presumption did not actually alter the elements of a castle-doctrine defense. Instead, subsection 2.1 "provides an evidentiary mechanism to aid in the factfinder's evaluation of the merits of a castle doctrine defense." ***Childs***, 636 Pa. at 335-36, 142 A.3d at 831-32. Subsection 2.1

> consequently creates a presumption that impacts the evidentiary burden of a defendant seeking its protection as well as the factfinder's analysis of the evidence in order to determine whether the defendant has established a castle doctrine defense. It is a law that provides a method to enforce the right of self defense as embodied by the castle doctrine. In short, it is a procedural statute.

***Id.*** at 1287 (quoting ***Childs***, 142 A.2d at 833).

The castle doctrine provisions relevant to the instant case are set forth in 18 Pa.C.S.A. § 505 (**Use of force in self-protection**) as follows:

> **(b) Limitations on justifying necessity for use of force**
>
> * * *
>
> (2.1) Except as otherwise provided in paragraph (2.2), an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death [or] serious bodily injury . . . if both of the following conditions exist:
>
>> (i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle[.]
>>
>> (ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

(2.2) The presumption set forth in paragraph (2.1) does not apply if:

\* \* \*

(iii) the actor is engaged in a criminal activity or is using the dwelling, residence or occupied vehicle to further a criminal activity[.]

\* \* \*

18 Pa.C.S.A. § 505(b)(2.1), (2.2).

With guidance from the Supreme Court's discussion of the castle doctrine instruction in *Childs*, this Court in *Cannavo* concluded:

Viewed in this light, and considering the castle doctrine's inclusion within the self-defense statute, it is apparent that the castle doctrine is an evidentiary means by which a defendant may attempt to prove justification by self-defense. Thus, it is subject to a similar, initial standard by which courts must assess the appropriateness of a self-defense instruction, namely, that "a valid claim of self-defense [or the castle doctrine] must be made out as a matter of law, and this determination must be made by the trial judge. Such claim may consist of evidence from whatever source." *Commonwealth v. Mayfield*, 401 Pa. Super. 560, 585 A.2d 1069, 1070 (1991) (*en banc*). In the case *sub judice*, the trial court was tasked with determining whether Appellant made a valid claim for the castle doctrine as a matter of law.

Subsection 2.1 requires both subsections 2.1(i) and 2.1(ii) to be met in order for the castle doctrine to apply. *See* 18 Pa.C.S. § 505(b)(2.1) (reasonable belief of deadly force is presumed necessary "if **both** of the following conditions exist" (emphasis added)). Subsection 2.1(i) lists, *inter alia*, the following requirements: (A) the victim is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, (B) a dwelling, residence, or occupied vehicle. 18 Pa.C.S. § 505(b)(2.1)(i). Subsection 2.1(ii) then provides that the defendant must have known, or had reason to believe, that the unlawful and forceful entry or act is occurring.

*Id.* at 1287-88.

- 10 -

Here, the trial court rejected Appellant's request for the castle doctrine instruction and instead delivered a general self-protection instruction in accordance with Section 505(a), which provides that "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion."  18 Pa.C.S.A. § 505(a).  As the trial court observed,

> Both instructions on justification provide a presumption that a defendant acted reasonably because both instructions explain to the jury that the Commonwealth has the burden to prove beyond a reasonable doubt that the defendant did not act in justifiable self-defense once the defense is properly raised.  While the castle doctrine instruction may state the presumption more clearly, the presumption itself is a matter of law under the applicable statute and [defense counsel] strenuously argued that presumption to the jury in closing.

Trial Court Opinion, 1/14/20, at 26-27 (footnote omitted).

Addressing Appellant's argument that he presented sufficient evidence to warrant a castle doctrine instruction, the trial court explained:

> [Appellant] argues that the statutory element of forceful entry does not actually mean **forceful entry** but, rather, that the entry itself can be peaceful and the force or forceful aspect can develop after entry.  This court concluded that such a construction is strained and does not comport with the language of the statute.
>
> Although the statute itself does not define the term "forceful entry," Black's Law Dictionary defines "force" as "power, violence, or pressure directed against a person or thing"; "forced entry" as "the act or an instance of someone's getting into a building illegally by breaking a door, window, etc.," and "forcible entry" as "the act of entering land in another's possession by the use of

force against another or by breaking into the premises."  Black's Law Dictionary 787, 788, 789 (11th ed. 2019).

Appellant concedes, as he must, that the evidence does not support a finding that McCray forcefully entered Appellant's apartment in the early morning of September 23, 2017.  Indeed, crediting Appellant's testimony regarding the events of that morning, as the court must, Appellant presented no evidence to support a finding that McCray unlawfully and forcefully entered Appellant's apartment.[9]  Thus, the evidence did not justify the instruction.

*Id.* at 30-31 (emphasis in original) (footnote omitted).

We agree.  The trial court appropriately denied the request for the castle doctrine defense because Appellant failed to satisfy the requirements of Subsection 2.1.

We also agree with the trial court's denial of the castle defense in light of the fact the presumption in Subsection 2.1 does not apply if the actor is involved in criminal activity.  *Id.* at 31 (referring to 18 Pa.C.S.A. § 505(b)(2.2)(iii))).  The court noted that testimony from Appellant and Ms. Oberreither, as well as numerous text messages between Appellant and McCray, supported a finding that the confrontation resulted from a dispute over drugs.  *Id.*  Appellant acknowledged that he smoked marijuana on essentially a daily basis, that he obtained his marijuana from McCray, and that

---

[9] At trial, Appellant testified that he unlocked the door to his apartment, intending to take out his trash.  However, he had to use the bathroom and did so "for literally just 30 seconds."  N.T., Trial, 5/10/18, at 141.  When he came out of the bathroom, McCray was in the doorway.  *Id.* at 142. There was no suggestion that any amount of force was used by McCray to enter the apartment after Appellant unlocked the door.

- 12 -

he owed money to McCray at times for marijuana. N.T., Trial, 5/10/18, at 123-29. He drank beer and smoked marijuana with McCray in Appellant's apartment on the night of September 22, 2017. McCray left Appellant's apartment at approximately 2:30 a.m. on September 23, 2017. *Id.* at 131, 136-37. Appellant texted McCray four hours later, at 6:29 a.m., hoping to get more marijuana on credit from McCray to smoke before going to work. *Id.* at 139. Appellant was getting ready for work when he heard someone (McCray) in his apartment. *Id.* at 140-41. "The evidence showed that the confrontation was the result of a dispute over drugs. Accordingly the court properly concluded that the acts also did not support the castle doctrine charge because Appellant was engaged in a criminal activity or was using his apartment to further a criminal activity." Trial Court Opinion, 1/14/20, at 31-32. Therefore, whether based on the failure to prove a forceful entry, or in light of the criminal activity taking place, the trial court did not err in denying the castle doctrine instruction.

Although the evidence did not warrant a Section 505(b) castle doctrine instruction, the trial court did appropriately deliver a self-defense instruction in accordance with Section 505(a). N.T., 5/11/18, at 154-58. Appellant was not prejudiced by the denial of an instruction unsupported by the evidence; he properly received an instruction that comported with the evidence presented. Finding neither abuse of discretion nor error of law in the trial

court's denial of a castle doctrine instruction, we shall not disturb that ruling. Appellant's jury instruction issue fails.

Appellant is not entitled to relief on either of his issues. Therefore, we shall affirm Appellant's judgment of sentence. In the event of further proceedings relating to Appellant's suppression motion, the parties shall attach a copy of the trial court's May 3, 2018 Findings of Fact and Conclusions of Law.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/22/21

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY,
PENNSYLVANIA
CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA     :      NO. 6944-2017

                 v.                      :

MICHAEL R. BELL                    :

*FINDINGS OF FACT AND CONCLUSIONS OF LAW
PURSUANT TO RULE 581(I) OF THE
PENNSYLVANIA RULES OF CRIMINAL PROCEDURE*

*FINDINGS OF FACT*

1.     The undersigned presided over a suppression hearing on Monday, March 19, 2018, on Defendant's March 12, 2018 Motion to Suppress Statements Made and Consents Given by Defendant.

2.     Officer Jason Hoover testified that he is currently a patrol officer for the municipality of Norristown and has held that position for a little less than eight (8) years.

3.     Sergeant Nicholas Dumas testified that he is currently employed with the municipality of Norristown as a patrol sergeant and has been with the Norristown Police Department for twelve (12) years. Prior to that, Sergeant Dumas worked as a police officer for Tullytown Borough in Bucks County and for the New York City Police Department for a combined period of four (4) years.

4. Detective Todd Richard testified that he works for the Montgomery County Detective Bureau and is currently assigned to the Homicide Unit, where he has worked for just under seven (7) years. Before that, Detective Richard worked for the Pottstown Police Department for eighteen (18) years, where he obtained the rank of Detective Corporal.

5. At approximately 8:13 p.m. on Saturday, September 23, 2017, Officer Hoover responded to a radio dispatch as a result of someone calling the police to report that he discovered a body inside of his apartment.

6. Officer Hoover responded to Riverside Apartments at 104 Schuylkill Avenue in Norristown dressed in full uniform with a side arm.

7. Commonwealth Exhibit CS-1 is a copy of the Norristown Police Incident Report from September 23, 2017, prepared by Officer Hoover, marked, identified and admitted over Defendant's objection.[1]

8. After arriving at the Riverside Apartments complex, Officer Hoover along with other officers, encountered Michael Bell ("Defendant") and two other individuals, Kaitlin Oberreither and Marquis Allen, in a parking lot at the end of "E" building.

9. Defendant initially told Officer Hoover that there was "a dead guy in his apartment".

---

[1] Counsel objected on the basis that the Commonwealth did not need to refresh the officer's recollection. The undersigned overruled the objection.

2

10. Officer Hoover described Defendant's demeanor and appearance as calm, collected, sober and had his wits about him. Defendant did not appear to be under any type of duress.

11. Defendant agreed to take the officers back to his apartment and led Officer Hoover, Corporal Gergel, Officer Graham and Officer Robinson to apartment EC9 on the third floor. Once on the third floor, there were approximately four (4) or five (5) stairs leading up to the door of Defendant's apartment.

12. Corporal Gergel opened the door to Defendant's apartment using the keys provided by Defendant and the officers entered the apartment.

13. Immediately visible upon entry, Officer Hoover saw a black male lying on or beside a couch, not moving, and blood splattered everywhere.

14. Officer Hoover participated in clearing the apartment to ensure that there were no attackers inside or that there was no one else inside needing assistance. After clearing the apartment, the officers moved back out into the hallway to make calls for police resources including requests for detectives, supervisors and the duty officer.

15. Officer Hoover approached Defendant to obtain Defendant's biographical information for his report. Defendant and Officer Hoover stood at the base of the stairs leading to Defendant's apartment within earshot of the officer's supervisors who were talking at the door of the apartment.

16. During Officer Hoover's conversation with Defendant in the hallway, Defendant spoke in a conversational tone; he appeared to be awake

3

and alert, as well as calm and collected. He did not appear to be under the influence of any drugs or alcohol.

17. While Defendant sat on the stairs, Officer Hoover obtained his biographical information, including full name, address, phone number, and then on to Defendant's general timeline for the day. Officer Hoover asked Defendant the name of the deceased male, whether he knew him, and when Defendant was last in his apartment.

18. Defendant replied that the decedent was Leroy, with no known last name, and that he was an occasional friend. Leroy arrived at Defendant's apartment around 7:30 a.m. and Defendant stated that he left his apartment at 8:30 a.m. and Leroy remained at Defendant's apartment.

19. Defendant told Officer Hoover that after he left the apartment he began walking north on DeKalb Street towards the Norristown Transportation Center. As he passed the Norristown Transportation Center, Defendant said a woman approached him to ask for a cigarette.

20. According to Defendant, he went with the woman to her house in Cherry Hill, New Jersey, until his return to Norristown at approximately 3:30 p.m. that day. After returning to Norristown, Defendant met up with his girlfriend, Kaitlin Oberreither, along Main Street and they went to a house party on or near the 500 block of Cherry Street in Norristown.

21. Defendant told Officer Hoover that he, his girlfriend and Marquis Allen left the party around 8:05 p.m. and returned to Defendant's apartment, where they discovered Leroy's body inside. After seeing Leroy's body, the three

4

of them backed out of the apartment and Defendant stated that he did not believe any of them had touched or handled anything in doing so.

22. Defendant stated to Officer Hoover that his air conditioning unit was turned off and his door locked when he left that morning. Defendant told Officer Hoover that Leroy was homeless, going "from couch to couch" staying with friends and that it was not unusual for Leroy to be at Defendant's apartment.

23. During Officer Hoover's gathering of this information, the tone was conversational, no one raised their voice, none of the officers brandished a firearm in Defendant's presence, no one threatened or restrained Defendant in any way and Defendant never appeared reluctant to speak with him.

24. Officer Hoover explained that Defendant was not a suspect at that time and that he did not advise Defendant of his rights under *Miranda*.[2] Defendant remained awake and alert and appeared to know what he was doing as he spoke with Officer Hoover.

25. Officer Hoover testified that it was standard protocol to ask someone who has discovered a dead body inside of their home to provide a written statement. When asked if he was willing to go to the police station to give a statement, Defendant replied in the affirmative. Officer Hoover led the way back to the parking lot and to his patrol vehicle.

26. After Officer Hoover checked Defendant to make sure he did not have any weapons on his person pursuant to the standard protocol, he had

_____

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5

Defendant sit in the back of the car and the officer got into the driver's seat and drove to the police station. Officer Hoover did not leave Defendant sitting in the patrol vehicle and he was not restrained except perhaps with a seatbelt that Defendant would have chosen to fasten.

27. Because Defendant was not in custody and entering the police department voluntarily, Officer Hoover did not take him into the building through the enclosed sally port, which would have been the case if Defendant was a prisoner. Instead, Officer Hoover pulled up to the patrol door on the outside of the building and opened the backseat door for Defendant to exit the secured vehicle.

28. Officer Hoover walked Defendant into the building and around the corner to the roll call room. Defendant joined Kaitlin Oberreither and Marquis Allen who were already there. Officer Hoover asked the three of them to keep their conversation to small talk and not to discuss the incident. Officer Hoover explained that this procedure is standard protocol in an attempt to keep witnesses from discussing an event, which may color their own recollection of what they saw or heard or did not see or hear.

29. None of the three witnesses were physically restrained or detained. All were provided with water and Officer Hoover walked Defendant out to use the restroom. Additionally, the door from the roll call room out into a hallway was left open. Officer Hoover testified that he would have walked Defendant out of the building and allowed him to leave if Defendant had expressed a

6

desire to do so because they had Defendant's contact information and he was free to leave.

30. Officer Hoover described Defendant as calm, almost tranquil, and cooperative. The tone was conversational and with no emotion.

31. Sergeant Dumas also responded to Defendant's apartment at Riverside Apartments on September 23, 2017. At approximately 9:52 p.m., Sergeant Dumas returned to the Norristown Police Department and met with Defendant in the roll call room to request Defendant's consent to search his apartment for scene processing.

32. Commonwealth Exhibit CS-2 is a copy of the Montgomery County Consent to Search form that Defendant signed on September 23, 2017, to search his apartment, marked, identified and admitted without objection.

33. Sergeant Dumas testified that he filled out the form in front of Defendant after Defendant had given his consent and then Defendant signed the form. No one threatened Defendant or promised him anything in return for his consent.

34. Sergeant Dumas believed that Officer Hoover and a female witness were in the roll call room at the time. Sergeant Dumas obtained Defendant's consent prior to Defendant's interview. Sergeant Dumas was wearing his detective uniform consisting of a polo shirt and khakis.

35. Sergeant Dumas described the tone as conversational, no one raised their voice and Defendant never indicated that he did not want anyone to search his apartment. Sergeant Dumas knew of no reason to think that

7

Defendant did not understand what was happening when the Sergeant requested Defendant's permission for the search.

36. Sergeant Dumas agreed with Counsel that law enforcement's purpose for searching Defendant's apartment was to obtain evidence to be used in prosecution of the homicide.

37. Detective Richard received a request to respond to the Norristown Police Department at approximately 9:03 p.m. on September 23, 2017, to assist with a homicide investigation.

38. Commonwealth Exhibit CS-3 is a copy of the Montgomery County Detectives Homicide Supplemental Report prepared by Detective Richard based on his response to the Norristown Police Department, marked, identified and admitted without objection.

39. Detective Richard testified that he arrived at the Norristown Police Department at approximately 9:45 p.m. whereupon he was quickly briefed and assigned with Norristown Detective Stephen Sowell to interview Defendant.

40. At approximately 9:50 p.m. Detective Richard and Detective Sowell went to the roll call room and found Defendant seated with the other witnesses. Detective Richard introduced himself to Defendant, shook hands, and told Defendant that he was there to speak with him. Defendant responded "ok" and the two detectives walked with Defendant to the detective office area of the police station to interview Defendant. Defendant was not in shackles or handcuffs, nor was he physically led to the open detective area.

8

41. The open detective office space contains five (5) cubicles. The door into this area remained open during the interview and other officers may have entered and exited while the three (3) men were in the area but no one else stayed. Detective Richard testified that he sat behind a computer at one desk, Defendant sat in a chair next to him, and Detective Sowell sat behind his own desk facing Detective Richard and Defendant.

42. Detective Richard was not aware of any other statements Defendant had given up to that time. While the detectives walked with Defendant to the open office area, they made small talk. Detective Richard regarded Defendant as a witness who could provide law enforcement with information so that they could begin to investigate the homicide. Detective Richard testified that he wanted as much information as he could obtain to investigate the murder.

43. Detective Richard testified that Defendant's demeanor was completely cooperative, talkative and casual. Defendant appeared to be awake and alert and not under the influence of drugs or alcohol.

44. Detective Richard was dressed in a polo-type shirt and tan khaki pants, while Detective Sowell was wearing shorts and a t-shirt. Neither detective had a weapon on them during the interview.

45. Detective Richard explained to Defendant that he would type a question, read it to Defendant word-for-word and then type Defendant's answer word-for-word. When the interview was finished, Detective Richard would print out the statement and Defendant would have an opportunity to review it and

9

make any corrections, additions, deletions or whatever to his statement. Detective Richard did the typing and asked the questions of Defendant.

46. Commonwealth Exhibit CS-4 is a copy of all of the statements Detective Richard took from Defendant, marked, identified and admitted without objection.

47. The first portion of the interview began at approximately 10:04 p.m. and consisted of six (6) pages of questions and answers, which begin as follows:

> Q: Michael, I am Detective Richard of the Montgomery County Detective Bureau and present with me is Detective Sowell from the Norristown Police Department. We would like to speak with you about the death of Leroy McCray. Is this okay?
> A: Yes
>
> Q: Can you read and write English?
> A: Yes
>
> Q: Are you currently under the influence of drugs or alcohol?
> A: No
>
> Q: Are you providing this statement to me voluntarily?
> A: Yes

(Investigative Interview Record of Michael Raymond Bell, 9/23/17 at 1, Commonwealth Exhibit CS-4).

48. The last questions and answers in the first portion of the statement were as follows:

> Q: Is everything you told me in this statement truthful?
> A: Yes
>
> Q: Will you now review this statement and make sure it's accurate?
> A: Yes
>
> Q: How were you treated by the police today?

10

A:    Good.

(Investigative Interview Record of Michael Raymond Bell, 9/23/17 at 6, Commonwealth Exhibit CS-4).

49.    The first portion of the interview ended at 10:57 p.m., at which time Detective Richard printed out the statement consisting of pages 1 through 6 and gave it to Defendant to review, make any changes and sign. Defendant signed at the bottom of each page without making any changes.

50.    Detective Richard gave Defendant a break while Detective Richard went to discuss the statement with Lieutenant Bradbury, who was the on-call Lieutenant in charge that night. Defendant went to use the restroom and take a break, returning with Detective Sowell to the open detective area when Detective Richard returned.

51.    At approximately 11:22 p.m. Detective Richard asked Defendant if it would be okay to reopen his statement and ask a few more questions. Defendant replied that would be okay. Detective Richard asked about Defendant's cell phone and a few follow up questions about where Defendant had been earlier in the day.

52.    The second portion of the interview ended at 11:48 p.m. and consisted of pages 7 through 9 in the typewritten statement, which were given to Defendant to review, make any changes and sign at the bottom of each page.

53.    Detective Richard gave Defendant another break and went to speak with Lieutenant Bradbury, who was coordinating the incoming information.

Defendant stayed in the detective work area with Detective Sowell during this break.

54. When Detective Richard returned, he asked Defendant if they could reopen his statement and ask a few more questions. Defendant agreed. The third portion of the statement started at 12:13 a.m. of September 24, 2018, and concluded at 12:20 a.m. Defendant reviewed and signed the single page ten after making a change in the middle of the page.

55. Detective Richard gave Defendant another break while Detective Richard went to speak with Lieutenant Bradbury to let Lieutenant Bradbury know that the detectives were going to find an office in the Norristown Police Department to continue the interview. Detective Richard testified that it had become apparent to him from what Defendant was saying and from what Lieutenant Bradbury was telling him, that Defendant had not been truthful in some of his prior statements.

56. Detective Richard returned to the open detective work area and explained to Defendant that they would be moving into an office. While Detective Richard was locating an office, Defendant was provided a drink and food. Detective Richard, Detective Sowell and Defendant then moved down the hallway into a lieutenant's office, which had a desk and a couple of chairs.

57. Detective Richard read and explained Defendant's constitutional rights from a form that Defendant signed, dated and answered two (2) questions indicating that he understood his *Miranda* or constitutional rights. Commonwealth Exhibit CS-5 is a copy of the *Miranda* warnings form that

Detective Richard read verbatim to Defendant, with Defendant's answers hand written in response to two (2) questions, marked, identified and admitted without objection.

58. Detective Richard described Defendant's demeanor during this time as unchanged, conversational, there was small talk, and there was joking at some points. Defendant gave no indication that he did not understand his constitutional rights, that he did not want to answer any more questions or that he wanted a lawyer present.

59. After Defendant signed the constitutional rights form, Detective Richard confronted him with the information that Detective Richard did not believe the previous statements that Defendant gave and the reasons why. The tone remained conversational. No voices were raised. No one threatened Defendant and he was not restrained in any way. Defendant paused for perhaps ten (10) seconds and then replied that he had killed Mr. McCray with a hammer.

60. Defendant still appeared awake and alert. Defendant gave the detectives no reason to believe that he did not understand what was happening. Defendant did not indicate that he did not want to talk to the detectives any more and Defendant did not ask for a lawyer.

61. Detective Richard asked Defendant if they could resume the interview and Defendant replied that they could. The final portion of the interview began at 12:45 a.m. on September 24, 2017, as follows:

Q: Michael, the time is now 12:45 AM and it's past midnight so the date is 9/24/2017. Detective Sowell and I have been speaking

13

with you and several minutes ago I stopped our conversation and explained to you your constitutional rights. Is that correct?

A: Yes

Q: Did you understand these rights?
A: Yes

Q: Did you sign a form agreeing to waive these rights?
A: Yes

Q: With these rights in mind are you willing to speak with us further?
A: Yes

Q: Have you been provided with food and breaks?
A: Yes

Q: Michael did you lie to us in your original statements?
A: Yes

Q: Why did you lie?
A: Because I was scared

Q: What exactly did you lie about?
A: That I met a girl and went to New Jersey and that Terry had arranged for Leroy to come there

Q: Did you kill Leroy McCray?
A: Yes I did

Q: How did you kill him?
A: I used a hammer

(Investigative Interview Record of Michael Raymond Bell, 9/24/17 at 11, Commonwealth Exhibit CS-4).

62. Detective Richard testified that once Defendant told him that he killed Mr. McCray with a hammer, Defendant was no longer free to leave. Up to that point, Defendant was free to leave the police station.

14

63. During the final portion of Defendant's statement, Detective Richard sought Defendant's consent for additional searches to which Defendant agreed.

64. Commonwealth Exhibit CS-6 is a copy of the Montgomery County Consent to Search form that Detective Richard filled out for Defendant's consent to search his Galaxy Note 5 cellular phone, marked, identified and admitted without objection.

65. Commonwealth Exhibit CS-7 is a copy of the Montgomery County Consent to Search form that Detective Richard filled out for Defendant's consent for Detective Richard to obtain a buccal swab or DNA sample from Defendant, marked, identified and admitted without objection.

66. Commonwealth Exhibit CS-8 is a copy of the Montgomery County Consent to Search form that Detective Richard filled out to obtain Defendant's consent for detectives to take photographs of Defendant's body, marked, identified and admitted without objection.

67. Commonwealth Exhibit CS-9 is a copy of the Montgomery County District Attorney's Office Consent to Videotape Statement form that Detective Richard filled out to obtain Defendant's consent to provide a videotape of Defendant's statement, marked, identified and admitted without objection.

68. Detective Richard read and explained each form to Defendant and after obtaining Defendant's consent, filled out the top part and requested that Defendant sign each form and put the date and time on each one. Detective Richard also signed each form.

69. The final portion of Defendant's statement concluded at 1:54 a.m. at which time Defendant Richard printed out pages 11 through 16 and asked Defendant to review the pages, make any changes and sign each one. Defendant did not make any changes to the final portion of his written statement. Defendant signed and put the date at the bottom of each page. Defendant told Detective Richard that he had been treated "great" by the police that day. (Investigative Interview Record of Michael Raymond Bell, 9/24/17 at 16, Commonwealth Exhibit CS-4).

70. When the written statement had concluded, Detective Richard took photographs of Defendant's face, arms and hands. In addition, Detective Richard collected a buccal swab from the inside of Defendant's cheek.

71. Detective Richard informed Defendant before he gave the videotaped statement that Defendant was no longer free to leave.

72. Because they needed more space for the camera, Detective Richard, Detective Sowell and Defendant moved back into the roll call room to take Defendant's videotaped statement. The videotaped statement began at 2:26 a.m. and concluded at 2:31 a.m.

73. Commonwealth Exhibit CS-10 is a copy of Defendant's Videotape Statement on a CD, marked, identified and admitted without objection. The Commonwealth requested to publish the video and without objection. Exhibit CS-10 was viewed in open court.

74. Detective Richard explained that on the video, Detective Sowell was seated to his right, Detective Henry was playing the part of Mr. McCray as

16

Defendant recounted the incident and Lieutenant Bradbury was working the camera directly across from Detective Richard. Detective Henry and Lieutenant Bradbury were dressed similarly to Detective Richard in a polo shirt and khakis. None of the law enforcement officers were carrying weapons.

75. Detective Richard testified that the video was the best demonstration of Defendant's demeanor throughout that night. No one raised their voice, none of the detectives brandished a firearm or threatened Defendant in any manner. Throughout the encounter with Defendant, he was not restrained in any way until after the video was completed and he was put in a cell.

76. Detective Richard testified that at no time did Defendant appear reluctant to speak with him. At no time did Defendant indicate that he did not want to speak with the detectives. Defendant did not ask for a lawyer at any time. Defendant appeared awake and alert. At no time did Defendant indicate that he did not understand what he was doing or what he was being asked.

## CONCLUSIONS OF LAW

1. When a defendant files a motion to suppress, the burden is on the Commonwealth to demonstrate by a preponderance of the evidence that the challenged evidence was properly obtained. Pa.R.Crim.P. 581; *Commonwealth v. Galendez*, 27 A.3d 1042, 1046 (Pa.Super. 2011) (*en banc*).

2. As it relates to this case, the Commonwealth bears the burden of proving by a preponderance of the evidence that a defendant's statement or

confession is voluntary. *Commonwealth v. Harrell*, 65 A.3d 420, 434 (Pa.Super. 2013) (citing *Commonwealth v. Nester*, 551 Pa. 157, 162-63, 709 A.2d 879, 882 (1998).

3. When ruling on a suppression motion, the suppression court is required to make findings of fact and conclusions of law as to whether evidence was obtained in violation of a defendant's constitutional rights and must determine whether the Commonwealth has established by a preponderance of the evidence that the challenged evidence is admissible. Pa.R.Crim.P. 581; *Commonwealth v. Davis*, 491 Pa. 363, 368, 421 A.2d 179, 181 (1980).

4. "[I]t is within the suppression court's sole province as fact finder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Baker*, 24 A.3d 1006, 1015 (Pa.Super. 2011); *accord Commonwealth v. Simmen*, 58 A.3d 811, 817 (Pa.Super. 2012).

5. Long-settled Pennsylvania law provides that there must be both custody **and** interrogation in order to trigger the safeguards of *Miranda v. Arizona*, 384 U.S. 436, 471-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Commonwealth v. Housman*, 604 Pa. 596, 625, 986 A.2d 822, 839 (2009); *Commonwealth v. Cruz*, 71 A.3d 998, 1003 (Pa.Super. 2013).

6. "In deeming an interaction to be a custodial interrogation, 'the police officer's subjective intent does not govern the determination but rather the reasonable belief of the individual being interrogated.'" *Cruz, supra.*

7. The mere fact that a police investigation has focused on a specific person does not automatically trigger 'custody' thus mandating *Miranda*

18

warnings for that person's statements to be deemed voluntary. *Commonwealth v. Levanduski*, 907 A.2d 3, 24 (Pa.Super. 2006) (*en banc*).

     8.    The *Cruz* Court reiterated:

> An individual is deemed to be in custody for *Miranda* purposes when he "is physically denied ... his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." The court must consider the totality of circumstances, including factors such as "the basis for the detention; the duration; the location; whether the suspect was transferred against his will, how far, and why; whether restraints were used; the show, threat or use of force; and the methods of investigation used to confirm or dispel suspicions."

*Id.* at 1004 (citations omitted); *accord Baker, supra* at 1019-20. *See also Commonwealth v. Templin*, 568 Pa. 306, 317-18, 795 A.2d 959, 966 (2002) (citing factors to consider including "the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.").

     9.    The *Baker* Court explained the standard and the test in general as follows:

> The standard for determining whether an encounter with the police is deemed "custodial" or police have initiated a custodial interrogation is an objective one based on a totality of the circumstances, with due consideration given to the reasonable impression conveyed to the person interrogated. Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." "Interrogation" is police conduct "calculated to, expected to, or likely to evoke admission." When a person's inculpatory statement is not made in response to custodial

19

interrogation, the statement is classified as gratuitous, and is not subject to suppression for lack of warnings.

\* \* \* \*

The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate Miranda warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.

Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.

\* \* \* \*

The fact that a police investigation has focused on a particular individual does not automatically trigger "custody," thus requiring Miranda warnings.

*Id.* (citations omitted); *accord Commonwealth v. Johnson*, 615 Pa. 354, 374, 42 A.3d 1017, 1028 (2012).

10. Interrogation is defined as questioning initiated by law enforcement or "police conduct calculated to, expected to, or likely to evoke admission" or an incriminating response. *Commonwealth v. Umstead*, 916 A.2d 1146, 1149, 1152 (Pa.Super. 2007) (citations omitted).

11. However, "the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 1150 (citation omitted).

20

12. Moreover, asking for biographical information or general background questions does not constitute interrogation within the meaning of *Miranda*. *Cruz, supra* at 1004; *Umstead, supra* at 1150.

13. In *Commonwealth v. Lyons*, 622 Pa. 91, 79 A.3d 1053, *cert. denied sub nom. Lyons v. Pennsylvania*, 134 S.Ct. 1792, 188 L.Ed.2d 761 (2014), the Pennsylvania Supreme Court explained:

> As a general rule, because of the inherently coercive nature of police custodial interrogation, statements elicited from an accused in that environment are inadmissible unless the accused was informed of and, *inter alia*, voluntarily waived his privilege against self-incrimination and the right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 471-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Commonwealth v. DeJesus*, 567 Pa. 415, 428-30, 787 A.2d 394, 401-03 (2001). Waiver is made voluntarily if the decision to make it is the product of a free and unconstrained choice.

622 Pa. at 114, 79 A.3d at 1066.

14. The *Lyons* Court continued:

> In determining whether a waiver is valid, a suppression court looks to the totality of the circumstances surrounding the waiver, including but not limited to the declarant's physical and psychological state, the attitude exhibited by the police during the interrogation, and any other factors which may serve to drain one's powers of resistance to suggestion and coercion. *DeJesus*, 567 Pa. at 429-30, 787 A.2d at 402-03.

*Id.*

15. In *Commonwealth v. Mitchell*, the Pennsylvania Supreme Court instructed that the totality of the circumstances must be considered in evaluating the voluntariness of a confession.

> The determination of whether a defendant has validly waived his *Miranda* rights depends upon a two-prong analysis: (1) whether the waiver was voluntary, in the sense that defendant's choice was not the end result of governmental pressure, and (2) whether the

21

waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice.

588 Pa. 19, 53-54, 902 A.2d 430, 451 (2006).

16. Finally, in *Templin, supra,* addressing the voluntariness of the waiver prior to the defendant's statement in that case, the Pennsylvania Supreme Court reasoned as follows:

> In determining voluntariness, the question "is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess." *Nester,* 551 Pa. at 163, 709 A.2d at 882; *Jones,* 457 Pa. at 430, 322 A.2d at 124 (same); *see also Miller,* 796 F.2d at 604 ("The question in each case is whether the defendant's will was overborne when he confessed"). "By the same token, the law does not require the coddling of those accused of crime. One such need not be protected against his own innate desire to unburden himself."

568 Pa. at 317, 795 A.2d at 966.

17. Instantly, Defendant asserts that his statements outside of his apartment and in the open detective working area must be suppressed because they were not voluntarily given.

18. Specifically, Defendant proffers that these initial statements were the product of coercion provided without *Miranda* warnings. In addition, Defendant argues that the subsequent statement and consents given after the *Miranda* warnings are fruit of the poisonous tree.

19. Considering the totality of the circumstances surrounding that statements Defendant provided at the scene as determined above, the

22

undersigned concludes that Defendant was not in custody at the time of these statements, nor was he interrogated.

20. These circumstances include the following facts:

A. The officers and detectives responded to Defendant's apartment building in response to a call made by Defendant and his two friends;

B. Defendant voluntarily led officers up to his apartment and provided his key for them to unlock the door to his apartment;

C. Defendant was not a suspect;

D. Once Defendant was comfortably seated on the steps leading to his apartment, Officer Hoover began taking down Defendant's biographical information and asking general questions to assist in the homicide investigation;

E. Officer Hoover did not ask any specific questions about Defendant's involvement, rather the inquiries were made to determine who may have had access to Defendant's apartment that day;

F. Defendant was awake and alert, calm and cooperative, appeared to understand what was happening and never appeared reluctant to provide the requested information;

G. The officers did not brandish any weapons during this time and the conversation remained calm with no raised voices;

H. Defendant was not placed in restraints or physically led anywhere;

23

I.    Defendant voluntarily agreed to accompany Officer Hoover to the police facility to assist with the investigation into Leroy McCray's death and provide a written statement;

J.    Officer Hoover did not ask any questions on the way to the police station;

K.    Officer Hoover brought Defendant into the police station through the patrol door instead of the enclosed sally port and walked him to the open roll call room; and

L.    Defendant sat with his friends while he waited to give his written statement.

21.    This Court found Officer Hoover's testimony to be very credible.

22.    Based upon these circumstances, no custodial interrogation took place leading up to Detective Richard's arrival. Accordingly, *Miranda* warnings were unnecessary.

23.    Considering the totality of the circumstances leading up to the fourth and final portion of Defendant's written statement, the undersigned concludes that Defendant was not in custody at the time of the first, second and third portions of his written statement.

24.    These circumstances include the following facts:

A.    Detective Richard and Detective Sowell arrived in the roll call room dressed in plain clothes and unarmed;

B.    Defendant voluntarily followed the detectives into an open detectives' office area;

24

C. Defendant was not placed in restraints or physically led anywhere;

D. The door to the area remained open throughout this time;

E. Defendant was not a suspect;

F. Defendant's demeanor was cooperative, talkative and casual;

G. Defendant appeared to be awake and alert and not under the influence of drugs or alcohol;

H. Defendant specifically stated he was giving the statement voluntarily;

I. Defendant was provided breaks to use the restroom, water and food; and

J. Defendant was free to leave the police station.

25. In addition, Detective Richard and Defendant maintained a conversational tone during the interview. The detectives did not raise their voices at any time. The detectives did not threaten Defendant or make any promises to him to obtain his statement. Defendant had not asked to leave and had not asked to stop the questioning.

26. Based upon these circumstances, no custodial interrogation took place leading up to and through the first three portions of Defendant's statement.

27. Accordingly, *Miranda* warnings were unnecessary during the first three portions of the interview.

25

28. Once Detective Richard suspected that Defendant may have not been truthful in his first three statements about where and with whom Defendant had been earlier that day, the Detective explained to Defendant that they would be moving into an office.

29. Once the detectives and Defendant had moved into the lieutenant's office for the fourth portion of Defendant's written statement, the undersigned concludes that the interview became a custodial interrogation necessitating *Miranda* warnings.

30. Detective Richard read Defendant his constitutional rights under *Miranda* before asking any additional questions.

31. Defendant acknowledged his rights as advised by Detective Richard and as he read on the waiver form.

32. Defendant reviewed and signed the waiver form.

33. Defendant did not ask to speak with an attorney.

34. In view of the totality of the circumstances surrounding the waiver, this Court concludes that Defendant voluntarily waived his rights to remain silent, to speak with an attorney before continuing with the questioning and to refuse to answer any questions.

35. These circumstances include the following facts:

A. Defendant was 34 years old on September 23, 2017;

B. Defendant was awake and alert and gave the detectives no reason to believe that he did not understand the questions or what was happening;

26

C. Defendant displayed no indicia of impairment;

D. There was no undue delay and

E. Defendant's responses to the questions were appropriate.

36. In addition, Defendant acknowledged that Detective Richard and the other detectives had treated him "great"; the tone of the detectives remained calm and conversational throughout the night; Defendant did not ask to end the interview; Defendant did not request to speak with an attorney; at no time did the detectives threaten Defendant or promise Defendant anything in exchange for his written statement, for the consents to search or for his consent to videotape his statement and Defendant took breaks to eat and drink and use the restroom.

37. This Court found Detective Richard's testimony credible.

38. Hence, Defendant voluntarily waived his constitutional rights under *Miranda* and that waiver is valid.

39. Having considered the totality of the circumstances surrounding Defendant's statements to the law enforcement officers, the undersigned opines that Defendant waived his *Miranda* rights and made his final portion of his written statement as well as his videotaped statement voluntarily, and that the consents he provided were the product of free and unconstrained choice.

40. Nothing in this opinion prohibits Defendant from arguing the voluntariness of his statement to the jury.

41.    An appropriate order follows.

BY THE COURT:

THOMAS P. ROGERS, J.

Copies sent on 05/03/18 to:
**By E-Mail:**
Deputy District Attorney Thomas W. McGoldrick
Assistant District Attorney Douglas Lavenberg
John F. Walko, Esquire, Defense Counsel
**By First-Class Mail:**
Michael R. Bell, Montgomery County Correctional Facility

Judicial Secretary

28